### IN RE PETERSON.

(Filed September 20, 1904).

1. ARGUMENT OF COUNSEL—*Opening and Conclusion—Superior Courts, Rules 3, 6.*

> The opening and conclusion of an argument in the superior court is discretionary with the trial court, except in the cases mentioned in rule 3, superior court rules.

2. WITNESSES—*Evidence—The Code, sec. 590—Wills.*

> On an issue of *devisavit vel non,* it is not competent to show by the caveators a conversation had with the testator, though it was in the presence of a person interested in the action at the time of the trial, but not at the time of the conversation.

3. EVIDENCE—*Wills.*

> On an issue of *devisavit vel non,* it is competent to show what was said by the devisee or legatee when notified of the execution of the will.

4. EXPERTS—*Evidence—Physicians and Surgeons—Wills.*

> On an issue of *devisavit vel non,* it is competent to ask a medical expert whether upon a given state of facts the testator was competent to make the will.

5. WITNESSES—*Experts—Physicians and Surgeons—Wills.*

> On an issue of *devisavit vel non,* the principle of law which attaches peculiar importance to the opinion of medical men upon questions of mental capacity does not apply to the opinion of expert physicians expressed upon hypothetical questions.

6. WILLS—*Undue Influence.*

> The fact that a man wills his estate to his wife, excluding his children, his father and other relatives, does not tend to show mental incapacity or undue influence.

THIS was an issue of *devisavit vel non,* heard by *Judge W. A. Hoke* and a jury, at April Term, 1904, of the Superior Court of BEAUFORT County.

The will of E. R. Peterson was executed on the 25th day of August, 1898, in which he devised and bequeathed to his wife, Hattie A. Peterson, his entire real and personal estate, appointing her executrix thereto. He died on September 6 of the same year, and the will was admitted to probate in the Superior Court on September 10th. The testator left no children. On January 2, 1899, the said Hattie A. Peterson executed her last will and testament, in which she devised and bequeathed unto Mary E. Baynor, now Mrs. Ira M. Hardy, her entire real and personal estate, appointing the said Mary E. her executrix, and the will was duly admitted to probate on May 6, 1901.

On July 17, 1901, B. F. Peterson and Mrs. Lucy A. Kern filed a *caveat* to the will of E. R. Peterson, alleging that the said "paper writing" was not the last will and testament of E. R. Peterson, for that "at the time he signed the same he did not have sufficient mental power and capacity to make

---

*In re* PETERSON.

---

and execute a valid will," and that the execution thereof was procured by the "importunity, coercion and undue influence of the said Hattie A. Peterson and others." An issue was thereupon made up and transferred to the Superior Court for trial. The jury having responded to the issue in the negative, judgment was rendered accordingly, and the propounder, having noted exceptions to the rulings and charge of the Court below, appealed.

*Rodman & Rodman, Bragaw & Ward* and *G. W. Ward,* for the propounder.
*Small & McLean,* for the caveator.

CONNOR, J. The propounder noted an exception to the ruling of his Honor in regard to the opening and conclusion of the argument. This being a matter resting in the sound discretion of the Court except in the cases mentioned in rule 3, the exception cannot be sustained. Rule 6, Clark's Code, 953. In the view which we take of the case, it is not necessary to pass upon all of the exceptions, as many of them may not arise upon another trial. Exceptions numbered 8 to 15 relate to his Honor's ruling in regard to the competency of Mrs. Kern and B. F. Peterson to testify to alleged conversations with the testator, E. R. Peterson, and his wife, Hattie A. Peterson, which were objected to under section 590 of The Code. It is alleged that these conversations were had in the presence of Mrs. Hardy, who was then a young girl of fourteen to sixteen years of age, and is now the executrix of Mrs. Peterson. Mrs. Kern testified that she came to Washington, the home of her brother, E. R. Peterson, in May, 1898, to see her brother, because she heard he was ill; that Miss Baynor, now Mrs. Hardy, was a very distant relative of her brother, and first cousin to Mrs. Peterson; that she did not stop at her brother's house on her visit

to him during his last illness; that she had always stopped there before.

To the following testimony the propounder objected, the objection was overruled and exception noted: "Mrs. Peterson told me in the presence and hearing of Miss Baynor that she did not want me at the house, and gave as her excuse that it put too much on her servant." She also testified, under objection, to other conversations with Mrs. Peterson in the presence of Mrs. Hardy and Mrs. Waters, to all of which the propounder excepted.

This testimony comes within the principle decided in *Pepper v. Broughton,* 80 N. C., 251, and is inadmissible, unless, as contended by the caveators, it is made competent by the decisions in *Peacock v. Stott,* 90 N. C., 518, and *Johnson v. Townsend,* 117 N. C., 338. *Pepper v. Broughton* was an issue of *devisavit vel non,* involving the validity of the will of one Lougee. The caveators showed by one Harris a declaration of the testator regarding the treatment of himself by the husband of the propounder. For the purpose of repelling this testimony she offered to prove by her husband that he "never refused to speak to Lougee," being the treatment complained of. This Court held that the witness was incompetent. *Dillard, J.,* says: "In this case Broughton is received to deny that he refused to speak to Lougee, and this was on his oath, and to this oath the other party to the action, Pepper, could oppose nothing except the statement in conversation with the supposed testator. It matters not whether the object of the testimony was to prove a speaking affirmatively or negatively; it was to prove something material between the witness and the deceased, about which the deceased could have testified if alive, and it was unjust to allow Broughton, by his evidence as to this point, to have any influence to establish one of the wills rather than the other, when Lougee could not be heard in reply." Here the allegation of

*In re* PETERSON.

the caveators is that the execution of the will of E. R. Peterson was the result of "importunity, coercion and undue influence" of Hattie A. Peterson and others.   B. F. Peterson and Mrs. Kern, the caveators, proposed to testify to alleged declarations of the testator, E. R. Peterson, and Mrs. Hattie A. Peterson, the devisee and legatee in the will, tending to establish their contentions.   Mrs. Peterson is dead, and is represented by Mrs. Hardy, her executrix and the beneficiary under her will.   The caveators contend that the proposed testimony is competent under the exception made to the general rule in *Peacock v. Stott, supra.*   We assume that his Honor concurred in that view.   The witnesses testified that Mrs. Hardy was present at some of the alleged conversations, and Mrs. Waters at others; that Mrs. Hardy was at that time between fourteen and sixteen years of age.   It is not alleged that she was a party to, or took any part in, or was in any way interested in the conversations or the subject matter of them.   In *Peacock v. Stott* a contract was alleged to have been made between one Alvin Peacock, Wyatt Earp, Redding Richardson and A. J. Taylor.   The plaintiffs offered to prove the terms of the contract by Peacock, Richardson being dead, the other parties living.   In response to an objection to the competency of the witness under section 590, *Smith, C. J.,* says: "The conversation sought to be elicited by the first interrogatory was with three persons, and to show their contract with the witness, so that these two living witnesses to the fact to which the testimony is directed could give their version of it, and the evidence of the witness would not be beyond the reach of correction or contradiction, and the reason for the exclusion would not exist.   As, then, the testimony is not within the words of the excluding proviso, nor the reason of the rule that it prescribes, we are of opinion that it ought to have been admitted."   In *Johnson v. Townsend, supra, Montgomery, J.,* says: "We think the conversation—

transaction—which the witness offered to prove by his own testimony was not strictly a conversation with the intestate, but was one held with him and two others, his sisters, the plaintiffs in this action, who were associated with him in the transaction." *Clark, J.,* in *Baker v. Blake,* 120 N. C., 177, points out clearly the principle upon which these cases are based: "In those cases the personal transaction was had with two or more persons associated in interest, and it was held that the death of one of them does not prevent such transactions being given in evidence when the associates of the decedent are living and parties to the action." This case is directly in point. It cannot be that because at the time of the alleged declarations of Mrs. Peterson, a young girl of sixteen years of age, having no interest in the making of Mr. Peterson's will or the disposition of his property, was present, the door is opened, after Mrs. Peterson's death, for the admission of the testimony of persons as to alleged conversations with Mr. and Mrs. Peterson, who are so deeply interested in invalidating the will. At the time of the alleged conversations Mrs. Hardy had no interest in the disposition of Mr. Peterson's property. We think that the testimony objected to was incompetent, and the exceptions relating thereto should be sustained. Of course any declarations of Mrs. Peterson relevant to the issue are competent to be proved by witnesses who do not come within the prohibition of section 590. Dr. J. C. Rodman, the physician of Mr. Peterson prior to and at the time of his death, and who was also a witness to the will, testified as follows: "I told him that you have told me that you have made a will, but I think you had perhaps better have it drawn up by a lawyer. I told Mrs. Peterson her husband had made a will in her favor, but advised her to have a lawyer draw it up for her protection." The propounder proposed to show by this witness that at the time he spoke to Mrs. Peterson about her husband's will she said that she would not

speak to him herself and would not let the doctor do so ; that she would rather let the whole of his property go than annoy him about it.　To this the caveators objected.　The objection was sustained and constitutes the basis of exception No. 20. It was charged and testimony introduced for the purpose of showing that she, by importunity and undue influence, procured the execution of the will.　We think that in rebuttal of such testimony it was competent to show her acts and declarations when advised to have another will written.　At that time there was no suggestion of any controversy in regard to her husband's will.　He had, it seems, made a will in her favor.　Dr. Rodman, thinking it safe to prevent trouble in regard to the form of the will—the description of the property—made a suggestion that it would be well to have it drawn by a lawyer.　Her conduct and declaration, showing the state of her mind and feeling upon the subject, were certainly relevant, and we can see no objection to the mode of proof. Dr. Rodman was one of the witnesses to the will, but had no interest in the disposition of the property.　The objection should be sustained.

E. R. Peterson, the alleged testator, was sick for several months prior to the execution of the will and his death.　Dr. Rodman testified that he, as his physician, took him to Baltimore in April, 1898, for the purpose of an operation, and told him that there was an element of danger in such operations, and asked him if his business affairs were arranged.　He told the witness that he had written his will and left everything to his wife.　The operation was performed.　He returned home. The witness usually saw him from one to three times a day. Some days he did not see him at all.　He gave him morphine occasionally.　He was always rational until the night before he died.　In the latter part of August the witness told him · that he was a sick man, and could not say that he would get well.　He told him that he (Peterson) had told the witness

that he had a will; but he thought perhaps that he had better have it drawn up by a lawyer. Peterson said that he would think about it next day. He asked the witness if William B. Rodman (a lawyer) was in town, and the witness told him no. At the witness' suggestion he sent for Mr. Bragaw (a lawyer), and Mr. Randolph came with him. Mrs. Peterson went out of the room. Bragaw asked him how he wanted his property left, and he said he wished it left to his wife. Bragaw then drew the will and Peterson signed it, and the witness, together with Randolph, witnessed it in presence of Peterson and of each other. Both saw him sign it. Bragaw told him that he had better specify some of his property and put the remainder in the residuary clause, which was done. After it was drawn and read, he asked if everything was left to his wife, and Mr. Bragaw said yes, and he signed the will. His mind was all right and he knew what he was doing. Dr. Rodman testified on cross-examination that he "was consulted by Peterson in December, 1897, or January, 1898. As early as March or April, 1898, he became satisfied that it was cancer and that it was incurable. He took him to Baltimore, where an operation was performed, and it disclosed cancer. It had no beneficial effect except to diagnose his disease. The malignant disease first started in the gall-bladder, then extended to the liver, which also became the seat of the disease. The tumors or nodules on the gall-bladder presented the appearance of a bunch of grapes. The bile-duct was also examined during the operation and was involved in the malignant disease. After his return from Baltimore he continued to grow worse, and his extreme jaundice continued and deepened in color. His falling off and emaciation also continued, so that at the time of his death he was a mere skeleton, weighing probably eighty pounds. This was his condition for some weeks prior to his death. The function of the liver is to secrete bile. The gall-bladder acts as a reservoir to hold the

bile after its secretion by the liver, and the bile-duct conveys the bile from the gall-bladder into the intestines. Bile is necessary to the assimilation and digestion of food, and without that death ultimately ensues. The result of the diseased condition of these organs was to obstruct the passage of bile into the intestines, and it produced jaundice, intestinal indigestion, and helped to starve him, but the malignancy of the disease had more to do with his emaciation than the jaundice. The blood became clogged with impurities and contained bile. Its presence in the blood produced jaundice. It is called bile poison. It impoverishes the blood. One result of bile poison of the blood is to produce in some cases languor, drowsiness, unconsciousness, como, and even death. The brain is nourished and fed by the blood, and if the blood is poisoned and impoverished it is bound to have some effect on the brain, in my opinion, although Mr. Peterson's brain was not impaired."

It was admitted that Dr. Rodman was an expert physician.

Dr. P. A. Nicholson was introduced by the propounder and testified that he was a practicing physician; knew Mr. Peterson and saw him during his last sickness; that the last visit he made him was in the third week in August, when he saw him about half an hour. He talked sensibly and reasonably; never saw him any other way; he knew Peterson had mind enough to make disposition of the property. On cross-examination he said the mind of Peterson was not impaired to any degree that he could discover. He was a very sick man, and the witness knew that he would never get up again, but it was not preposterous for him to hope to get well; he had cancer of the gall-duct, and that class of patients are always very sanguine.

The caveators introduced Dr. John G. Blount, who was admitted to be an expert physician. He testified in regard to the function of the liver, etc., to which there was no objec-

tion.   He was asked the following question: "If the jury should find from the evidence that Peterson was in the physical condition testified to by Dr. Rodman, and should further find from the evidence that it was accompanied by flightiness of the mind, incoherency of speech, impairment of memory and a lack of continuous power of thought, together with a weakened and emaciated condition of his body, would he, in your opinion as a physician, during the last two or three weeks of his life, have sufficient mental capacity to know what property he had, to whom he was giving it, and how he was giving it, in case he undertook to make a disposition of it, assuming that the jury should find the facts stated in this question to be established by the evidence?" To this question the propounder objected; the objection was overruled and the propounder excepted.   He answered that in his judgment he would not.

The caveators introduced Dr. S. T. Nicholson, whose testimony was substantially like that of Dr. Blount.   The exception to the testimony cannot be sustained.   These witnesses were examined as experts; they did not see the alleged testator, and their opinions were expressed upon hypothetical questions, the form of which has been approved by this Court.   A large number of witnesses were examined by the propounder and caveators in regard to the mental condition of the alleged testator, in which there was a wide difference of opinion expressed.   Mr. Bragaw and Mr. Randolph corroborated the testimony of Dr. Rodman.

A large number of special instructions were presented to the Court by the propounder and the caveators, some of which were given, several were modified and a number refused, to which exceptions were noted.   We think it necessary to notice only two of the exceptions to the charge.

At the request of the caveators, the Court instructed the jury as follows: "That the caveators, the brother and sister

of E. R. Peterson, have offered certain witnesses, Dr. J. G. Blount and Dr. S. T. Nicholson, who are termed medical experts; that these witnesses have testified that in the latter stages of the disease, from which Peterson was suffering and died, they would expect to find certain symptoms and conditions, among them the loss of memory, impairment of mind, inability to fix the attention, want of coherency, drowsiness and stupor, lack of will power and resistance; and these medical experts further testified that if these conditions and symptoms did exist, then, in their opinion, the said Peterson did not have the capacity to make a will.    Now the Court instructs you that the law attaches peculiar importance to the opinion of medical men upon the question of mental capacity when they testify to mental capacity on matters within the domain of their professional experience and training, as by study and experience in the practice of their profession they become experts in the matter of bodily and mental ailments." The propounder excepted to this instruction, for that it selects two of the physicians who were examined as experts who never saw the alleged testator while he was sick, and who testify only upon the hypothesis that certain physical conditions, accompanied by certain mental conditions, are found by the jury to exist, and ignores the testimony of two other physicians who express opinions based upon actual personal knowledge of the condition of Peterson at and near the time of making the will.    While it may be that upon a critical view of the language of his Honor it is capable of this construction, it will be observed that his Honor adopted the language of the prayer of the caveators, which was evidently drawn with a view of presenting to the jury the principle announced as to the weight to be given to the opinions of medical men in regard to mental condition.    Dr. Rodman and Dr. T. A. Nicholson testified as to the actual conditions, giving their opinions deduced therefrom, while Dr. Blount and Dr. S. T.

Nicholson testified as experts only. We are quite sure that his Honor did not intend the jury to understand that the law attached more importance to the opinion of the medical witnesses who had never seen the alleged testator than it did to the opinion of those who had seen, and one of them attended him in his last illness. His evident purpose was to announce a general principle which would apply to all of the medical witnesses. However this may be, the propounder presents by the exception a more serious question: Is the principle, as applied by his Honor to the testimony of Dr. Blount and Dr. P. A. Nicholson, correct? Does it apply to the testimony of witnesses who have no personal knowledge or observation upon which their opinions are based? In *Flynt v. Bodenhamer,* 80 N. C., 205, a careful examination of the facts shows that the matter in issue was the mental condition of one Speace, who had executed the note sued upon. Dr. Jones testified that he had been a practicing physician for thirty years and "attended the deceased in his last illness." He explained the nature of his disease and its effect upon the mental faculties, expressing the opinion that he was incapacitated from executing the note. The Court said to the jury: "The law likewise attaches peculiar importance to the opinion of medical men who have the opportunity of observation upon a question of mental capacity." * * * *Smith, C. J.,* discussing an exception to this instruction, said: "But the opinion of a well-instructed and experienced medical man upon a matter within the scope of his profession and based on personal observation and knowledge, is and ought to be carefully considered and weighed by the jury in rendering their verdict." In conclusion, the learned Chief Justice says that "It cannot admit of question that the opinion of the medical expert who attended the deceased during his last fatal illness and must have become familiar with his disease and its effects upon both body and mind, should have greater weight and

possess a higher value in determining his mental as well as physical condition than the opinion of an unprofessional man." While the distinction sought to be established by the propounder is not clearly pointed out, the language of the Court is confined to cases where the witness had personal knowledge and observation, and is fully sustained by the textbooks. In discussing this question the author of Rogers on Expert Testimony, p. 476, sec. 204, says: "We have seen in the preceding section that courts have asserted that the opinions of physicians on questions of mental capacity are entitled to greater weight than those of ordinary witnesses. An examination of those cases, however, shows that the opinions of medical men are considered entitled to greater weight than the opinions of non-professional persons, provided the physicians have had personal observation and knowledge of the person whose capacity is the matter in issue. The cases which follow show that if the medical men have not had such personal observation and knowledge of the individual, their testimony has not been considered as entitled to greater weight than is the testimony of ordinary witnesses who have personally observed and known the individual in question.

In *Goodwin v. State,* 96 Ind., 550, 561, *Elliott, J.,* says: "It would have been error for the Court to tell the jury that the expert witnesses, speaking merely as to matters of opinion and basing their opinions on hypothetical questions, were entitled to more credit than witnesses who had knowledge of facts gathered from personal observation and who based their opinions on actual facts and not supposed cases. As both kinds of evidence are competent, the jury are charged with the weight and effect of the evidence in each particular case, and the Court has no right to charge them to give preference to one class or the other." Where the expert states precise facts in science as ascertained or settled, or states the necessary and invariable conclusion which results from the facts

stated, his. opinion is entitled to great weight. Where he gives only the probable inference from the facts stated, his opinion is of less importance because it states only the probability. Rogers, *supra,* p. 484; *State v. McCullock* (Iowa), 55 L. R. A., 378, 89 Am. St. Rep., 382. Several eminent Judges and authors express the opinion that the rule, even as limited, is not sound and should be rejected. Certainly, in view of the wide divergence and often irreconcilable opinions expressed by medical experts in respect to mental capacity upon personal knowledge of conditions and hypothetical questions, the principle should not be extended beyond the limits herein prescribed. We have a striking illustration in this case of the danger of undertaking to prescribe any rule for weighing the testimony otherwise than by the opportunities for knowing the facts upon which their opinions are based. Of the four intelligent physicians examined, two express positive opinions that the testator had sufficient mental capacity to make the will, and two with equal confidence express opinions exactly to the contrary. It would seem that the safer rule would be to permit the entire evidence to go to the jury to be weighed and considered by them in the light of all the other evidence upon the question. The exception of the propounder to his Honor's instruction must be sustained. Wharton on Evidence (2d Ed.), sec. 454; Taylor on Evidence, sec. 58; *Kempsey v. McGinnis,* 21 Mich., 123.

His Honor, in response to the prayer of the caveators, instructed the jury that "if E. R. Peterson had died intestate, and having died without children, his widow would have been entitled to one-half of the personal estate and to dower in his real estate, and his brother and sister would have been entitled to the other one-half of his personal estate, and also to his real estate subject to the widow's right of dower. The caveators insist that the fact that E. R. Peterson, by the said paper-writing, entirely excluded his blood from any share in

his estate and gave the whole thereof to his widow, is a circumstance, to be considered, tending to show lack of mental capacity to make a will, and the Court so charges you." His Honor repeated this language, concluding: "Is a circumstance to be considered on the question of undue influence exerted upon him to make the alleged will?" To both these instructions the propounder excepted. Mr. Underhill, in his excellent work on wills, says: "The fact that a man bequeaths his estate to his wife, excluding his children, his father and other relatives, is absolutely immaterial upon the question of undue influence. The silent influence of affection and respect augmented by the tender and kindly attention of a faithful wife cannot be regarded as in any sense undue influence." Underhill on Wills, p. 212. An examination of the cases cited by the author sustains the language quoted. In the light of the experience and observation of men of the best judgment and soundest minds, we can see nothing in the fact that this man gave his estate, the produce of their joint industry and economy, to his wife, tending to show mental incapacity or undue influence. We do not think it tended to show either undue influence or mental incapacity. It seems in the light of the testimony the most natural and fitting expression of affection and solicitude of the testator. His acts and declarations and his letters written to her are all consistent with the disposition which he made of his estate. The exception should be sustained.

While we do not deem it necessary to pass upon the exception to the refusal of the Judge to dismiss the proceeding for that there was no evidence of undue influence, we think it proper to say that when the caveators rested their case there was, in our opinion, no such evidence. The propounder, however, waived this exception by introducing evidence. For the reasons pointed out, there must be a

New Trial.

*In re* PETERSON.

WALKER, J., concurring in the result.    I concur fully in the decision of the Court in this case that there should be a new trial, and for the reasons so clearly and conclusively stated by *Justice Connor;* but, as I do not think it is necessary to pass upon the competency of the question which the caveators' counsel asked the witness, Dr. John G. Blount, as to the mental capacity of the testator, the appeal having been disposed of by other rulings, I am unwilling to commit myself to the correctness of the decision upon the question so put to the medical experts.    I prefer to consider and decide that matter when it is necessary to do so, and after a careful study and examination of it in the light of the precedents.    As at present advised, I am strongly inclined to the opinion that the question was incompetent, as the witness was called upon to give an answer which, if it was acted upon by the jury, would have decided the issue for them instead of leaving the ultimate fact of mental capacity, which was the very substance of the issue, to be found by the jury upon a review of the evidence, and so that the conclusion when reached would have been that of the jury and not the mere adoption of the opinion of the witness.    A witness may testify to the mental condition and the mental and physical characteristics of the person whose mental capacity is in question, but it seems to me that he should not be permitted to give an opinion as to whether he has or has not sufficient mental capacity to execute a will or a deed, for this is a mixed question of law and fact, and, besides, the question in its scope is as broad as the issue itself.

As I understand the law in regard to expert and opinion evidence, such a question is forbidden because the witness must pronounce upon the law, and, besides, in answering the question he would be exercising a function which, under our system of jurisprudence, belongs exclusively to the jury.    He passes beyond the limit prescribed for such evidence and

enters the domain of fact and law instead of opinion merely. While I have had little time to investigate the subject, it seems to me that the views which I have expressed are fully sustained by the cases of *Smith v. Smith,* 117 N. C., 326, and *Clary v. Clary,* 24 N. C., 78. In the first of those cases the witness testified that "no power on earth could influence the vendor," whose deed was alleged to have been procured by undue influence. The Court held this to be incompetent as the equivalent of an opinion upon the very fact in issue, and as comprehensive as the issue itself, citing *Clary v. Clary, supra.* The cases of *Smith v. Smith* and *Clary v. Clary,* and also *McDougald v. McLean,* 60 N. C., 120, are in perfect harmony, when they are considered with reference to the special facts of each of them, and they do not, in my opinion, sustain the decision of the Court upon a question similar to the one we are now discussing, in *Whitaker v. Hamilton,* 126 N. C., 465. In *Clary v. Clary* the witness was not required to express his opinion as to whether the vendor had sufficient mental capacity to execute the bill of sale, but his testimony related solely to her general mental condition, and his answer did not by any means necessarily imply that she did not have mental capacity sufficient for that purpose. Weakness of mind merely is not the same as mental incapacity to execute an instrument. It may be some evidence to show the existence of the latter, but does not exclude the idea of its nonexistence. What was said by *Judge Gaston* in *Clary v. Clary* must be considered in relation to the particular question asked the witness in that case, and had reference to mental condition or soundness and not to mental capacity, which is quite a different thing, as shown in Rogers on Expert Testimony (2d Ed.), p. 164, sec. 69, where it is said that the "weight of authority is opposed to allowing the witness to express an opinion as to whether an individual had the mental capacity to dispose of his property by will or deed."

In Lawson on Expert and Opinion Evidence (2d Ed.), p. 155, the rule is thus stated: "Capacity to make a will is not a simple question of fact. It is a conclusion which the law draws from certain facts as premises. Hence it is improper to ask and obtain the opinion of even a physician as to the capacity of any one to make a will. Under our system that question was addressed to the jury. All evidence which tended to shed light on his mental status, the clearness and soundness of his intellectual powers, should have gone before them. This being done, however, the witness should not have been made to invade the province of the jury." See also *Walker v. Walker,* 34 Ala., 470; *In re Arnold,* 14 Hun., 525; *Reg. v. Richards,* Fos. & Fin., 87, and *Fairchild v. Bascom,* 35 Vt., 416, citing *Crowell v. Kirk,* 14 N. C., 356, in which *Judge Ruffin* says: "As far as we perceive the meaning (of the question) we suppose the attempt was to get the opinion of the witness, whether the supposed testator had capacity *to make a will.* * * * If this was the purpose of the inquiry it was properly refused, for the witness is not to decide what constitutes mental capacity or a disposing mind and memory, that being a matter of legal definition. He might state the degree of intelligence or imbecility in the best way he could, so as to impart to the Court and jury the knowledge of his meaning, that they might ascertain what was the state of the testator's mind and memory; but whether that was adequate to the disposition of his property by will did not rest in the opinion of the witness." *Judge Daniel,* who wrote the opinion of the Court in *Crowell v. Kirk,* says, at page 357: "The defendant's counsel asked his own witness, Harris, if in his opinion the testator was capable of making a will; an objection being made, the witness was not permitted to answer the question. I do not think that the Judge erred in this. The opinions of witnesses in England are confined to persons of science, art or skill in some particular

branch of business, and they have to give the reasons upon which their opinions are founded. All other witnesses are to state the facts, and the jury make up their opinions on the facts thus deposed to. In this country the Courts have said that the law placed the subscribing witness about the testator to ascertain and judge of his capacity. But no case has gone the length of permitting the evidence of opinion offered in this case to go to the jury." The case last cited, it seems, is directly in point and explains what is said in *Clary v. Clary,* so as to reconcile that case with the authorities.

But the evidence of the witness in this case is more objectionable than would be that of an expert who had personal knowledge of the facts upon which he bases his opinion, and the latter is, as we have seen, incompetent to give such testimony. The witnesses, Dr. Blount and Dr. S. T. Nicholson, whose evidence was substantially the same, were permitted to testify that if the jury found the testator manifested certain symptoms and conditions stated in the hypothetical question, he did not have mental capacity sufficient to make a will. Medical experts, who have never seen the testator or observed his symptoms or general mental and physical condition and characteristics, testify not as to the effect which the disease of which these symptoms are indicative was likely to have upon the testator's mind or memory or upon his general mental or physical condition, which are strictly matters of opinion and proper subjects of expert testimony, but they depose to a fact, upon evidence at second hand, and superadd their opinion upon the law applicable to those facts. This, it seems to me, is a clear violation of the rule relating to such testimony.