Battle, J.
 

 Upon the construction of the marriage articles, we are clearly of opinion, that the defendant’s wife had the power to dispose of her slaves during her coverture without the consent of her husband. The intention of the parties is to be collected from the language of the instrument, and that is too plain to be misunderstood. In it there is an express provision that she “ is to have full power to give, sell or convey her property at any or all times which must mean during the marriage as well as at any other time, both because there is nothing in the instrument to restrict the generality of these words to any particular time ; and because it is immediately added that if she be the longest liver, “ she shall have power and authority to take or retain the possession of her own propertythereby showing that the preceding clause was intended to give her the power to dispose of it as she might think proper, during coverture, free from the control of her husband. But notwithstanding this, we think that the deed of conveyance for the slaves, obtained by the plaintiff, cannot be sustained. The proofs taken in the cause clearly satisfy us of these prominent facts: that Frances Satterfield, the wife of the defendant, was, at the time when she executed the deed, about eighty years of age, of infirm health and impaired mind, that she was much under the influence of her slaves and easy to be imposed upon, that the plaintiff was her great nephew, and that though he had occasionally visited her, there was no intimacy between them until the conveyance for the slaves was executed, that after that time his visits become more frequent and his attentions more
 
 *178
 
 marked, that he gave her small presents of money and other articles, that the deed was executed secretly in the woods at a distance of more than two hundred yards from the house, no persons being present except the parties and the subscribing witnesses, and that the latter were brought .to the place by the plaintiff from his own neighbourhood, about twenty miles distant from the house of the defendant, that the execution of the deed was studiously concealed from the defendant and that he knew nothing of it until several months afterwards, and that the grantor advised with no other person than the plaintiff in relation to it. These facts alone, independent of other circumstances, and admitting that the grantor had sufficient mental capacity to make a binding contract, require that the conveyance obtained from her should, in order to be supported, be reasonable in itself, and should appear to have been obtained by the plaintiff without the use of any unfair means, and without the exercise of any undue influence. Was the conveyance a reasonable one? It was made to a great nephew, one only among several other l'elations of equal and nearer degree, who does not appear to have
 
 done any thing to
 
 entitle himself to her particular regard, previous to its execution. It deprived her husband after her death of all the slaves which she owned, the most of whom he had been at the trouble and expanse of raising. He seems to have lived with her upon terms of affection, to have been kind and indulgent to her, and always disposed to gratify her wishes and caprices. There is not a particle of evidence to show that she had ever intimated an intention of disposing of her property, contrary to his wishes. It does not appear that she was aware of her legal right to execute a deed without joining him, until it was mentioned by the plaintiff himself, when he bought the two slaves on the 1st day of July,-only a few days before the deed in question was executed. From these considerations we are bound to say, that the deed, if not unreasonable, is, at least,
 
 *179
 
 some-what extraordinary. This alone however, is not sufficient to invalidate it. The law has no inflexible standard for reasonableness in the disposition of property, and must yield something to caprice. Let us see then whether the plaintiff practised any unfair means in obtaining the conveyance from his aunt. We have no direct evidence of any practices before the execution of the instrument. But we are satisfied from what then took place, that she had been previously and secretly prepared for that transaction. It appears that he had ascertained that she had the right to dispose of her slaves without the consent of her husband; for he said, when he bought the two slaves on the 1st of July, that he did not care whether the old man signed the bill of sale or not; that her signature was sufficient. A few days afterwards, he prepared the instrument in question at home, and called upon two of his neighbors to accompany him for the pur* pose of attesting the execution, telling them that he did so because his aunt and himself did not wish it made public. He then went in company with his witnesses to a retired place in the woods near the defendant’s house, where he left them and went alone to the house, from which he sent his aunt to the witnesses, he following on at some distance behind her. Before his arrival the witnesses read the instrument over to her, when she objected to it, because it purported to convey an absolute present interest in the slaves, without reserving her a life estate in them, contrary to her agreement with the plaintiff. When he came up, the objection was mentioned to him, and he wished her to execute it upon a pledge of his word, that she should retain the slaves during her life. She still objected; and he then gave her a written authority to keep the slaves until her death and she thereupon executed the conveyance. All this was studiously concealed from her husband, and he did not hear of it until several months afterwards, and, so far as we can discover, the grantor consulted no person but the plaintiff in rela
 
 *180
 
 lion to the preparation or execution of the instrument. We cannot consider an instrument thus obtained, as fairly obtained. But without deciding the effect which this may have upon its validity, let us see whether it was procured by the plaintiff by the direct or indirect exercise of any undue influence over his aunt. The evidence on this part of the case consists principally of the reflected lights thrown upon the transaction by subsequent occurrences. It is very clearly proved, that the slaves had great influence over their mistress, and it appears from the readiness with which they left the defendant’s house, after the death of his wife, that the plaintiff had acquired great influence over them. He had several times had private interviews with
 
 them before the
 
 death of their mistress, and his conduct on one occasion was so suspicious, that it incurred the censure of the defendant. The old woman too, some time after the conveyance said, “ that if she had known before hand what she then knew, she never would have made the conveyance,” adding “O ! if I could see James (meaning the plaintiff) I would tell him what I think of him ; he has disappointed me.” These things satisfy us that the plaintiff did exercise an undue influence — most probably, indirectly through the slaves — in procuring the conveyance from his aunt.
 

 In considering the questions, whether the conveyance was a reasonable one, and whether it was fairly obtained, we have treated the grantor, as having sufficient capacity to make a valid contract. The testimony satisfies us that she had. It is true that many witnesses, whose opportunities for observation were good, have expressed a contrary opinion. But the facts which they state, do not justify the inferences which they deduce from them ; and the testimony of the two subscribing witnesses clearly shows, that she well understood the provisions of the instrument which she was about to execute, so far at least as her own interests were concerned. But while her reason,or instinct — call it what you will — remained suffi
 
 *181
 
 ciently strong, amid the general decay of her mental faculties.to enable her to protect her own rights from open invasion, she certainly was not capable of fairly considering, and duly estimating, the just claims of others. Age and infirmity had done their work upon her mind, as well as upon her body, and it was an easy task for any person, so disposed, to procure from her any conveyance of her property which he might desire ; provided only that he took care not to interfere with her own immediate present interests, or those of her slaves which she had come to consider as identical with her own. The instrument, which she executed, was absolute in its terms, and conveyed an immediate title to the slaves mentioned in it. But as the plaintiff at the same time executed another instrument by which he assured the possession of the slaves to her during her life-time, its operation was pretty much the same as that of a will; and it may be treated as a will, in every enquiry into the capacity of the grantor, and the means by which it was' obtained. As it is irrevocable in its nature, it certainly cannot claim to be considered upon any better footing than a will. How then would a will be regarded, obtained under the same circumstances ? We think it cannot be doubted a probate Court would pronounce against it. The principal cases which ha,ve come before the Courts upon this subject are referred to in
 
 Stock
 
 on the law of
 
 non compotes 49.
 
 He says that,
 
 “ the
 
 proof of partial imbecility combined with undue influence has been held in very numerous cases to invalidate a will.” Even some peculiar position of the party benefitted, as the connexion of a favorite domestic companion with a testatrix, old and weak, has been held a principal ground for overtoiling a will.
 
 Bridges
 
 v.
 
 King,
 
 1 Hagg. Rep. 256. It is true that Sir John Nichols in one
 
 case, Williams v. Gaude,
 
 1 Hagg. Rep. 581, declared “that the influence to vitiate an act must amount to force or coercion, destroying free agency — it must not be the influence of affection or attachment — it must not be the
 
 *182
 
 mere desire of gratifiying the wishes of another, for that wouldbe a very strong ground of support of a testamentary act.” “ But” says
 
 Stock,
 
 “ so narrow a definition denotes that the learned Judge understood the phrase ‘ undue influence’ in a less extended sense than the cases in general give to it.” Upon the whole it seems that in coming to a conclusion in questions of this kind, “ the extent of capacity, the nature of the influence, the character of the party influencing, his connection with the party influenced, the benefit he derives from the will, all form materials for consideration,”
 
 Stock
 
 on
 
 non compotes ubi supra.
 
 We have done in this case what the author from whom we quote, states to be necessary. We have taken into our deliberate consideration all the materials, which the pleadings and the proofs furnish us, and the conclusion
 
 to
 
 which we have come is, that the deed of conveyance executed by the wife of the defendant to the plaintiff is too extraordinary in itself, and was obtained under too many circumstances of secrecy and suspicion from a very aged, infirm and weak-minded woman, to be upheld in this Court.
 

 The bill must be dismissed with costs.
 

 Per Curiam.
 

 Decree accordingly.