The facts and assignments of error will be set forth in the opinion.
The exceptions and assignments of error of caveators are as follows:
"1. That his Honor erred in excluding the testimony offered by the caveators as to the admission of Mrs. E. J. Stephens, second wife and widow of the alleged testator (hereafter denoted as testator) who with her two youngest children were principal devisees and legatees, as to the weakened mental condition of her husband and her alleged undue influence over him, as set forth in the exceptions.
"The substance of this testimony being that John Stephens, son of testator, was ordered away from his father's home by his stepmother; that Mrs. Stephens said she was going to take charge of her husband's business and see what became of the rest of his property; that Mrs. Stephens told witness that there had a great change come over Mr. Stephens during the past several years, `We could handle him, do anything we wanted to, and he would give up to us. . . . Anything we asked him to do he would go ahead and do it; . . . we could manage him any way we wanted to; that Mrs. Stephens told the witness her husband had lost money, but she would see what became of the rest of it; that he did not have sense enough to look after his business, was not like he used to be, could be led into anything; that Mrs. Stephens made unfavorable comments about the children of the former marriage, stating among other things, that she would not permit them to know of his death and burial if she could prevent it; that Mrs. Stephens told *Page 269 
witness that her husband's mind had considerably failed and that she and her son, Joe, had to watch him and look after him, that he was not capable of attending to business; all of which evidence was duly offered by the caveators and excluded by his Honor.
"2. That his Honor erred in directing a verdict in favor of the propounders on the issue of undue influence, having stated at the conclusion of the caveator's evidence as set forth in the 12th exception, `That he would instruct the jury that there is no sufficient evidence to justify them in answering the issue as to undue influence in favor of the caveators, and that it would be their duty to answer it in favor of the propounders'; and again in his charge to the jury as set forth in the 13th exception, stated: `Now, gentlemen, you come to consider the third issue, which is: Was the execution of the said paper-writing procured by undue influence? The court instructs you that there is no sufficient evidence in this case to justify you in answering that issue "Yes," and in finding that any person exerted any undue influence upon the deceased in executing his will, so it would be your duty to answer that issue "No," upon the evidence in this case.'"
On the record in this Court, the only contest is over the exceptions and assignment of error on the issue "Was the execution of said paper-writing procured by undue influence?"
The caveators charge that the execution of the will of E. J. Stephens was procured by undue influence on the part of his second wife, Civil Ann Stephens. E. J. Stephens, by his first wife, had seven children — five were living and two dead at the time of his death. One daughter, Maggie Lenora Byrd, married John W. Byrd — both were dead and left five children. Both Byrd and wife were dead at the time the will was executed on 31 March, 1921. E. J. Stephens died 6 January, 1924. By his second wife he had three children.
E. J. Stephens' entire property was left to his wife and the two youngest of her children. The land willed, when first purchased by E. J. Stephens, was almost all in woods. The boys by the first wife cleared up about 100 acres of the land and worked on the farm until the first piece purchased was paid for. E. J. Stephens married his second wife, Civil Ann Stephens, the fall after his first wife died. The boys worked on the land until they were about 19, 20 and 21 years old and left. Some lived not far from him. The relationship between E. J. Stephens and all of his children at the time of his death was good. It was in evidence that E. J. Stephens had about 450 acres of land when he died, worth about $100.00 an acre, for which he paid about $3.00 an acre. There was evidence to show "a change in his mind and body in the last 8 or 10 years. He was easily influenced," not that way before. *Page 270 
George A. Wicker, a neighbor of E. J. Stephens for 42 years, testified: "I do not think from my association with him for the last three or five years that he had mental capacity to know his property, his people, his relations, and had mental capacity sufficient to make a will, knowing the effect that the will would have upon his family, on 31 March, 1921."
It was in evidence that the second wife would often speak to her husband about the Byrd children "they did not care anything about him," and tried to prevent him from going to see them. She spoke about his son Will, saying "Will moved back to this county because his father was getting old and would soon die and he wanted to get a part of his property."
Sarah McLean, a half-sister to E. J. Stephens, testified that "he spoke affectionately of his different children," etc. She further said: "After he was taken down sick, witness visited him in his home; while there he stated he had made his will and if he ever got able to travel he was going to change it. Witness told him he could get someone to come to his house and fix it for him. He never said what way he wanted to change it. Mrs. E. J. Stephens and her daughter, Mollie, were present in the room, but neither made any response when the question of changing the will was mentioned."
The will substantially leaves all his real and personal property to his second wife for life and the remainder to her two youngest children, Joseph S. Stephens and Mary Jones Stephens; 50c to the heirs of his dead daughter, Maggie Lenora Byrd; to his other six living sons 50c each, including Cleveland C. Stephens the oldest child by his second wife, who was not living with his father. The second wife and her two youngest children lived with E. J. Stephens. The testator was much older than his wife.
There was evidence on the part of the propounders that on 29 July, 1914, the testator made and executed a will, this being written in the office of the witness, Walter P. Byrd, in the town of Lillington, and was witnessed by the same witnesses that witnessed the will offered for probate; that in this will his property was devised exactly as in the will propounded for probate with the exception that in the last will he made provisions for the disposition of property acquired since the writing of the first will, giving the after-acquired property to his wife for life, and then to his son, Joe.
There was evidence on the part of the propounders tending to show that on 13 March, 1921, that he came up to the auditor's office in the county courthouse, by himself, and asked A. M. Shaw, the executor named in the first will, to procure his will which was done, and thereupon he directed A. M. Shaw to rewrite the will of 1914, disposing of his property as in said former will with the exception of devising his *Page 271 
after-acquired real estate to his wife for life and then to his son, Joe, and in accordance with said instruction said A. M. Shaw prepared the last will which is the paper-writing propounded for probate; that thereupon E. J. Stephens called in the same witnesses who had witnessed his will before and requested them to witness his present will; that the same was left in the hands of A. M. Shaw, who was named as executor in the second will as well as in the first.
There was evidence on the part of Dr. W. C. Melvin and J. W. Halford to the effect that they were well acquainted with the deceased during his life time, and that in their opinion he was up to a few days before his death, a man of sound mind and with sufficient intelligence to make a will, knowing the effect of the same.
There was further evidence on the part of Marvin Wade, J. W. Byrd, and N.W. Parker, and others, to the effect that the deceased during all his life was a man of strong mental capacity; that he was a man of good business judgment, was successful in the management of his own affairs, and a man of strong purpose and firm and unyielding in his convictions.
The court below charged the jury, in part, as follows: "Now, gentlemen, you come to consider the third issue, which is `Was the execution of said paper-writing procured by undue influence.' The court instructs you that there is no sufficient evidence in this case to justify you in answering that issue `Yes,' and in finding that any person exerted any undue influence upon the deceased in executing this will so it would be your duty to answer that issue `No' upon the evidence in this case."
The proposition for us to decide is: Was the evidence excluded competent and, if competent, was it, with the other evidence in the case, sufficient to be submitted to the jury under the issue of "undue influence." We think the evidence excluded competent and the entire evidence on all the facts and circumstances of the case, should have been submitted to the jury.
The question of "undue influence" can be shown by direct evidence or by circumstantial evidence. A wide range of inquiry into the family relations is usually allowed.
In the case at bar, testator had eight living children at his death and children of a daughter who had predeceased him. His entire property was left to his second wife and her two youngest children — who were living with him when he died. The other children were left 50c each and all his grandchildren by his daughter 50c. We are not now considering testator's mental capacity to make a will, but we are considering whether there was any evidence of "undue influence" by his second wife. *Page 272 
"As the strength or weakness of mind of the testator and his susceptibility to influence are important in determining whether undue influence was exerted, the physical and mental condition of the testator, together with his age, is, under an issue of undue influence, a proper subject for consideration by the jury, the evidence tending to show such condition is admissible. However, evidence tending to show total mental incapacity cannot be received under an allegation of undue influence." 40 Cyc., p. 1156 (II).
In re Will of Mrs. Hardee, 187 N.C. p. 383, it is said: "In the first place, it should be observed that his Honor says the giving of the whole estate to one child, to the exclusion of other children, `in the absence of some reasonable ground for such preference,' would constitute what the law calls an unnatural will (but he did not say this was an unnatural will), and such fact `may be considered, with the other evidence in the case, as evidence upon the question of mental capacity and undue influence.' See Inre Burns' Will, 121 N.C. 338; In re Worth's Will, 129 N.C. 228, and Inre Mueller's Will, 170 N.C. 30. In a previous portion of the charge, the jury had been instructed upon this point as follows: `If you are satisfied that she made an unreasonable disposition, but are not satisfied that she was lacking in testamentary capacity, or that she was unduly influenced, that cannot affect you in any way. You would disregard the question of reasonableness or unreasonableness, because, as I have already said, she had a right to make any disposition she saw fit, if she had capacity and was not unduly influenced.'"
The evidence on the part of the propounders was that the first will was made 29 July, 1914, and the second 31 March, 1921, and they were practically the same, except that some after-acquired property testator gave to his wife for life and then to his son Joe.
Allen, J., In re Mueller's Will, 170 N.C. p. 29, writes fully on the controlling influence, and says: "As said In re Everett's Will, 153 N.C. 85: `Experience has shown that direct proof of undue influence is rarely attainable, but inferences from circumstances must determine it.' It is generally proved by a number of facts, each one of which standing alone may have little weight, but taken collectively may satisfy a rational mind of its existence.' It is `said to be that degree of importunity which deprives a testator of his free agency, which is such as he is too weak to resist, and will render the instrument not his free and unconstrained act. It is closely allied to actual fraud; and, like the latter, when resorted to by an adroit and crafty person, its presence often becomes exceedingly difficult to detect. Indeed, the more skillful and cunning the accused, and the more helpless and secluded the victim, the less plainly defined are the badges which usually denote it. Under *Page 273 
such conditions, the results accomplished, the divergence of those results from the course which would ordinarily be looked for, the situation of the party taking benefits under the will towards the one who has executed it, and their antecedent relations to each other, together with all the surrounding circumstances, and the inferences legitimately deducible from them, furnish, in the absence of direct evidence, and often in the teeth of positive testimony on the contrary, ample ground for concluding that fraud or undue influence has been resorted to and successfully employed. Grove v.Spiker, 72 Md. 300.' 18 A. and E. Anno. Cases, 412."
In 40 Cyc., p. 1155 (b) it is stated: "Where the grounds of objection to the validity of a will are fraud and undue influence, the evidence is permitted to take a wide range and it is declared that every fact and circumstance, no matter how little its probative value, which throws light on these issues, is admissible. The range of inquiry may cover not only the provisions of the will itself and the circumstances surrounding its execution, but also the mental condition of the testator, the motive and opportunity of others to unduly influence him, his relations with persons benefited by or excluded from the will, and the acts and declarations of such persons. Although none of these matters, standing alone, may be sufficient to establish the issues, yet taken together they may have that effect. Of course evidence which throws no light whatever on the question whether fraud or undue influence was exerted, and which is wholly immaterial and irrelevant, should be excluded, as should also evidence which is too remote in point of time to furnish any reasonable ground of inference that the testamentary act was effected by undue influence."
Testator left his property to his second wife, Civil Ann Stephens, and her two youngest children, and propounders contend if the evidence is competent and the entire evidence sufficient to be submitted to the jury, the declarations of Civil Ann Stephens tending to show undue influence should not bind her two children. The testator, Civil Ann Stephens and their two children were all living together in the same house.
The instant case is in many respects like Mullen v. Helderman,87 N.C. 471. Smith, C. J., said, at p. 472: "Upon the trial, and after the testimony was heard, the proof of formal execution and sufficient mental capacity in the deceased was not controverted, but conceded by the contestants, who resisted the probate upon the ground of undue influence exerted over the mind and volition of the deceased, by his wife, in procuring the making of the instrument in the sole interest of herself and her own children, to the exclusion of the children of the deceased by a former marriage, and in the impairment of that freedom essential *Page 274 
to the validity of a disposition in a testamentary act. . . . (p. 477). But we prefer to sustain the ruling upon the ground of identity of interest among the beneficiaries and its common origin in an act by which that of each is secured, and when the mother bears to her children a relation not unlike that of agent to principal, and admitting the rule that when the latter claims the benefit of what the former has done without previous authority, he must submit to the conditions and attending incidents of the act itself."
But propounders contend that this evidence was incompetent to bind the two children, and rely on Linebarger v. Linebarger, 143 N.C. p. 229. In the Linebarger case, the alleged testator gave almost his entire estate to his wife, Caroline Linebarger, for life, remainder to two of his sons, being the youngest, Hosea and Marvin Linebarger. There was no competent evidence that Marvin or Caroline Linebarger used any undue influence with the alleged testator. The question in the case, on this aspect, was whether Hosea's declarations regarding his conduct for his own benefit should be used against them and defeat their interest in the alleged will. The court said that it could be used only against Hosea. In the Linebarger case, and in this case, there was no proof of conspiracy — common design — no joint action among the parties. In the present case, will the alleged declarations of the mother, Civil Ann Stephens, affect the two children's interest in the will? The relationship existing between the parent and two children, the alleged undue influence exerted by the mother is the source naturally from which she and the two children would be enriched. We think this alleged undue influence exerted by the mother, under the facts and circumstances of this case, affect not only the mother but her two children, and goes to the validity of the entire will, and as said by Smith, C. J., in the Mullen case, supra: "And admitting the rule that when the latter claims the benefit of what the former has done without previous authority, he must submit to the conditions and attending incidents of the act itself."
In this case the mother was the agency through which the alleged testator was induced to favor his two youngest children, all living under the same roof, and exclude those who had gone out in life from the "old homestead."
The case is not free from doubt, but, on account of the peculiar relationship existing between the parties, if the mother exerted undue influence on the testator, under the facts and circumstances of this case, it went to the validity of the entire will.
From a careful review of the entire record and the law, we think there should be a
New trial. *Page 275