In re Will of JOHN S. EFIRD, W. T. Efird, Caveator, v. R. L. SMITH et al., Propounders.

(Filed 31 January, 1928.)

**1. Appeal and Error—Review—Scope and Extent in General.**

Where the caveat to a will is duly filed and the trial regularly had upon the sole theory that the testator did not have mental capacity to make it, on appeal the caveator may not successfully contend that it was invalid for undue influence brought to bear upon the testator, and that therefore it was not in fact his will, but that of another.

**2. Evidence—Materiality—Sufficiency to Raise Issue — Issue — Wills — Undue Influence—Evidence Thereof.**

When there is evidence upon the trial of a caveat to a will tending to show that the testator was a man of good mind and judgment at the time of the making of the will in question, that for some time theretofore he had given much care and study to the disposition of his property and that the paper-writing admitted to probate in common form was in accordance with his desires frequently expressed to others who were not personally interested therein, and had nothing to expect therefrom; *Held,* further evidence that he had named his attorney as one of several executors therein, who had acted at his request, and had consulted with his wife and had asked her if she were satisfied with the disposition of the estate, is not alone sufficient to raise the issue of undue influence.

**3. Wills—Testamentary Capacity—Requisites.**

In order to make a valid will the mind and memory of the testator must be sufficient at the time to reasonably understand the extent and nature of the property he is disposing of and its distribution among those who may naturally have a claim upon him and the extent and manner he desires it to be distributed, with the further requirement that the will be in writing and signed by him, or by some person at his request, and also at his request witnessed by two persons in his presence.

**4. Appeal and Error—Review—Harmless Error—Wills—Requisites and Validity—Nature and Essentials of Testamentary Dispositions.**

While it is only required that the caveator show the absence of one of the essential elements of the testator's mental capacity in order to set aside a will, the failure of the court, in his instructions to the jury, to recognize and instruct particularly as to each under the evidence, will not be held for reversible error, when it appears that the error was purely technical, and the jury, from the evidence and the charge construed as a whole, were not misled thereby, but understood the law applicable to the case.

**5. Evidence—Materiality—Sufficiency to Raise Issue—Issue.**

· While it is the better practice to submit two issues to the jury, when the pleadings and evidence raise them, one on the sufficient mental capacity of the testator and the other upon the question of undue influence, the latter becomes unnecessary when the evidence upon the trial is insufficient to have it considered, and no prejudicial error is committed by the court in relation to the first one.

APPEAL by caveator, W. T. Efird, from *Bowie, Special Judge,* and a jury, at May Term, 1927, of STANLY. No error.

The issue submitted to the jury and the answer thereto was as follows: "Is the paper-writing propounded for probate dated 20 August, 1926, and every part thereof, the last will and testament of John S. Efird? Answer: Yes."

The necessary facts and assignments of error will be set forth in the opinion.

*James A. Lockhart for W. T. Efird, caveator.*

*T. L. Caudle, Brown & Sikes, W. E. Smith and Cansler & Cansler for propounders.*

*T. C. Guthrie for Mrs. Estelle E. Morrow.*

CLARKSON, J. John S. Efird died on 19 January, 1927, leaving surviving him his widow, Bertie E. Efird, and three sons, J. J. Efird, W. G. Efird, and W. T. Efird. W. T. Efird filed a caveat to a paper-writing dated 20 August, 1926, probated in common form—proceeding *in rem*—before the clerk of the Superior Court of Stanly County, as the last will and testament of John S. Efird. *In re Little's Will,* 187 N. C., p. 177. In the paper-writing, R. L. Smith, W. G. Efird, and J. J. Efird are named as executors, and R. L. Smith, Charles A. Cannon and the Wachovia Bank & Trust Company, of Winston-Salem, N. C., trustees, and Mrs. Bertie E. Efird, W. T. Efird, J. J. Efird and W. G. Efird, Mrs. Estelle E. Morrow, and the children of W. T. Efird, and the children of W. G. Efird and the children of J. J. Efird, and the children of Mrs. Estelle E. Morrow are named as devisees, legatees and bene-

ficiaries under said paper-writing. The proceeding was duly transferred by the clerk to the civil issue docket for the trial of the issue of *devisavit vel non.* On the trial the propounders introduced in evidence the paper-writing purporting to be the last will and testament of John S. Efird, with the name of the three witnesses signed to the paper-writing (only two required under law of this State, C. S., 4131). The witnesses testified that the paper-writing was signed, sealed, published and declared by John S. Efird to be his last will and testament in their presence, who, at his request and in his presence and in the presence of each other, subscribed their names as witnesses thereto. They further testified, in substance, that at the time John S. Efird signed the will he had sufficient mind to know the nature, character and value of his property, who his relatives were and those benefiting by his bounty, and the disposition he was making of his property by this will. The propounders rested.

On the part of the caveator, some 18 witnesses were examined. The caveator contends "that the evidence was to the effect that John S. Efird was an old man, in feeble health. That in their opinion he did not have the mental capacity to understand the nature and extent of his property, the natural objects of his bounty and the disposition he was making of it by will. Others testified, that in their opinion, he could understand who his relatives were and their claims upon him, but not the extent of his property and disposition he was making of it. Others, that he understood with reference to his relatives and property, but could not understand the disposition he was making of this property. That Mr. Efird, who owned a large estate, was worried about the disposition of his estate."

### The Paper-writing Propounded as a Will.

It made certain provisions for his wife. The household and kitchen furniture, etc., for her sole use so long as she lives, the residence, house and lot, for her life and at her death to the trustees to be held by them as all other property. The will states that it is in lieu of dower and distributive share as she had considerable estate both real and personal, and had expressed herself as not desiring to take dower and distributive share in the estate. It also provided for her an ample support and maintenance out of the estate according to and suitable to her needs and condition in life, "to provide liberally" and details the manner.

In Item 6, the division is set forth as follows: "It is my will and desire, and I do so direct, that the net income from my estate be divided into five equal parts, and said shall be paid out semiannually by my trustees until the dissolution of this trust as follows, and the

following proportions: One-fifth (⅕) to the children or bodily heirs of my son, W. T. Efird (the caveator in· this proceeding) to each share and share alike; provided, however, that said fifth shall be held and invested by my said trustees for the benefit of his said children, and so much thereof used as may be necessary from time ·to time for their support, maintenance and education; and also, if necessary, certain portions of said one-fifth of my income may be used for the support and maintenance of their parents, as their needs may actually require; and the remainder of said income not so used to be paid out to each of said children respectively, share and share alike, as they become 25 years of age. One-fifth (⅕) to my son, W. G. Efird; provided, however, that he is sober, industrious and law-abiding, but if in the opinion of my trustees he is not such, then the said fifth to be invested by them for the benefit of his children, and so much of it used as may be necessary for their support, maintenance and education; and the remainder of said income not so used to be paid over to each of said children, share and share alike, as they become 25 years of age. One-fifth (⅕) to my son, J. J. Efird; provided, however, that he is sober, industrious and law-abiding, and if in the opinion of my trustees he is not such, then said fifth to be invested by them for the benefit of his children, and so much of it used as may be necessary for their support, maintenance and education; and the remainder of said income not so used to be paid over to each of said children, share and share alike, as they become 25 years of age. One-fifth (⅕) to my adopted daughter, Estelle Efird Morrow, provided, however, that she is economical and shows a disposition to take care of and properly use said income, but if in the opinion of my trustees she is not such, then said fifth to be invested by them for the benefit of the said Estelle Efird Morrow and her children, and so much of it used as may be necessary for her and their support, maintenance and education; and the remainder of said income not so used to be paid over to each of said children, share and share alike, as they become 25 years of age. One-fifth to charity and benevolences (the specific objects to be hereinafter designated by a codicil to be attached hereto)."

Provision is made in case of the death of any child, etc. (Estelle E. Morrow being considered a legal child), before the dissolution of the trust.

"Item 7. On 1 December, 1941, if my wife, Bertie E. Efird, be then dead, said trust shall be dissolved, except as hereinafter provided, but if she be then living said trust shall not be dissolved until her death, but it shall not be dissolved until the happening of both events. On the happening of both events, said trust shall be· dissolved and my

trustees shall divide my estate into five equal parts to be paid out and disposed of by them as follows; to wit:

"One-fifth (⅕) to the children or bodily heirs of my son, W. T. Efird (the caveator in this proceeding), who are living at that time, to be divided among them share and share alike. If any of said children shall die before said date and leave bodily issue, then said children of the deceased child shall represent their ancestor and take his or her share; provided, however, that said trustees shall hold and invest said estate for the benefit of said children and pay it to each one as he or she respectively becomes 25 years of age.

"One-fifth (⅕) to my son, W. G. Efird; provided, however, that he is sober, industrious and law-abiding, but if in the opinion of my trustees he is not such, then said fifth shall be paid to his children, share and share alike; provided, however, said trustees shall hold said fund and keep same invested, and use so much of same as is necessary for their support, maintenance and education until each of said children shall respectively reach the age of 25 years.

"One-fifth (⅕) to my son, J. J. Efird; provided, however, that he is sober, industrious and law-abiding, but if in the opinion of my trustees he is not such, then said fifth shall be paid to his children, share and share alike; provided, however, said trustees shall hold said fund and keep same invested and use so much of same as is necessary for their support, maintenance and education until each of said children shall respectively reach the age of 25 years.

"One-fifth (⅕) to my adopted daughter, Estelle Efird Morrow; provided, however, if she should die before the dissolution of this trust, then the same to be paid to her living children, share and share alike, when each of them shall respectively reach the age of 25 years.

"One-fifth (⅕) to charity and benevolences (the specific objects to be hereafter designated by a codicil to be attached hereto)."

Provision is made that certain deeds that have been made for houses and lots, where Estelle E. Morrow, J. J. Efird and W. G. Efird live, shall be kept by the trustees and delivered to them at the dissolution of the trust. They to be charged in the final distribution of the estate .. ............. sum without interest.

The trustees to pay W. T. Efird (caveator in this proceeding) $1,000 in installments from time to time as in their judgment is best for him according to his needs. All advancements made to any of the children, without interest, to be deducted from their portion in the final division of the estate. The three executors and secretary to the executors, are to receive $1,000 each in full compensation for winding up the estate before they turn over the residue to the trustees. Provision is made giving the trustees power and authority in their discretion to sell any

real and personal property, special care being taken to avoid any specu-
lation, and make profitable investments recommending the investments.
The trustees to keep a "clear and concise" record of all transactions, the
transactions of the estate and trusts herein created, "which record shall
at all times be subject to the free inspection of my heirs and distributees
under this will." H. L. Horton, his trusted friend, to keep the record,
and on his death, resignation or inability to perform the duties, the
trustees to elect a successor. The trustees and secretary shall receive
in full compensation for their services three per cent on the gross re-
ceipts of all the income derived from the trust fund and three per cent
on all disbursements and distributions of said income. The three per
cent to be divided equally between the three trustees and secretary.
R. L. Smith, W. G. Efird and J. J. Efird are appointed executors, and
H. L. Horton, secretary to the executors. R. L. Smith, Chas. A. Cannon
and Wachovia Bank & Trust Co., are appointed trustees and H. L.
Horton, secretary to the trustees. In case of death, resignation or in-
ability of any of the trustees to discharge the duties of the trust, the
resident judge of the Judicial District is designated to appoint a suc-
cessor or successors.

*The evidence: on the part of the propounders,* was to the effect that
John S. Efird, the testator, had developed high blood pressure and was
overweight, which overtaxed his heart. He entered St. Peter's Hospital,
Charlotte, 30 April, 1926, and left 20 May. He was put on a diet and
his flesh reduced. The will was made 20 August, 1926.

Some forty-nine witnesses testified for the propounders. Those who
knew him and saw him at different times mainly during the period of
1926 and up to the time of his death. This evidence was as. to his con-
dition before he went to the hospital, at the time he was in the hospital,
the time the will was made and until his death. They testified, in sub-
stance: That in their opinion, the condition of his mind was normal,
at no time any evidence of mental weakness. He had sufficient mind
to know the nature, character and value of his property, who his rela-
tives were, the objects of his bounty and what disposition he was
making of his property by will. This was the opinion of Dr. Gage, who
was his physician when at the hospital and his trained nurse, Lucy
Buchanan, who was also of the opinion: "His mental condition was
apparently not affected by his physical condition." The opinion of his
wife and attorney. Dr. Addison G. Brenizer, whom he consulted pro-
fessionally and who saw him afterwards, testified: "I wouldn't have
thought of his mental condition as being anything but good. It never
occurred to me that he was not normal at any time." Dr. W. I. Hill,
who has lived in Albemarle 29 years and knew him well, was at stock-
holders meeting of the Stanly Bank in January, 1927, "day before he

got sick. The apparent condition of his mind at that time was good.
. . . In August, 1926, I am of the opinion that Mr. Efird had
plenty of ability to block out his will or direct anything that he had
that he wanted to do with it." Dr. Brunson, a practicing physician in
Albemarle, "The apparent condition of his mind at all times when I
treated him was good." Dr. J. C. Hall, his family physician who treated
him with Dr. Gage, testified to the same effect as Dr. Gage. Dr. Laton,
eye, ear, nose and throat specialist living in Albemarle, known John S.
Efird practically all his life, "especially in August, 1926, it is my
opinion that Mr. Efird had mind sufficient to know and comprehend
the kind, character and value of his property, the natural objects of
his bounty, those having claims upon him and how he was disposing of
it by will if he was doing it." To the same effect was the testimony of
S. H. Hearne, who had known him 40 to 50 years "came in close con-
tact with him." Witnesses who had business dealings with him in all
walks of life, testified that during the period in question he was normal,
transacted his business matters as he always did and had mental capacity
sufficient to make a will. Chas. Smith, a wholesale grocer, testified:
*"I considered Mr. Efird had the brightest mind in Stanly County.
. . . I have read part of this will and have heard part of it read. I
think he would have understood the clauses and their effect without legal
advice; I think he was fully capable."*

In regard to one-fifth to charity and benevolence, the objects of which
to be designated in a codicil, but was not done, R. L. Smith, testified:
"When he spoke of dividing his estate into five parts, he said he wanted
one-fifth of his estate to go to charity and benevolences, he said the
Lord had been good to him, and he had been successful and he felt like
he really owed this amount to the Lord and he wanted it to go for
purposes of that kind. Mr. Efird was in a very earnest state of mind
at the time."

*The setting:* At the time of the execution of the paper-writing in
controversy, the testator had a wife by a second marriage, Bertie E.
Efird, about fifty years of age, three sons (including the caveator) and
one adopted daughter, Mrs. Estelle E. Morrow. The caveator being
about forty-five years of age and having a wife and ten children, the
oldest of whom was married and the youngest, an infant in arms, the
other two sons, W. G. and J. J. Efird being considerably younger, each
being married and having several children; Mrs. Estelle E. Morrow, an
adopted daughter, was about twenty-six years of age, had been married
since she was twenty, and had three children. However, she had never
been legally adopted. Mrs. Efird, though the second wife of the testator,
practically reared the two younger boys and Mrs. Morrow, who was
looked upon and treated as one of the children.

It appears from the evidence that while the testator was very fond of all of his sons, and their wives and children, including W. T. Efird, the caveator, and his wife, that he considered that the caveator did not have the ability to properly manage and preserve the share of testator's estate to which he would have been entitled had there been no will. It appears from the paper-writing, in Items 6 and 7, that he provided for the support and maintenance of the caveator and his wife for a long period, and their blood, the children to get support, maintenance and education and the *corpus.* It appears from the evidence, that the chief asset of the estate was the Efird Manufacturing Company, consisting of some five mills, engaged in manufacturing different grades and classes of yarn from both long and short staple cotton. That the testator, after the death of J. W. Cannon, in 1922, became president of the company, and as such, continued to have general management and control of its affairs up to the time of his death. That his second son, W. G. Efird, was vice-president, and this third son, J. J. Efird, was treasurer, and that these young men were intimately associated and connected with their father in the operation and management of the mill, in which the caveator took no part. John S. Efird owned more than half of the voting stock. At the time the will was made, the caveator was running a public swimming pool, that the testator had built and given him.

The property left by John S. Efird, the gross value is estimated to be worth a million, three hundred and fifty thousand dollars, and perhaps more, and his net income was $126,251.00 for the last year of his life.

There were no exceptions taken by caveator to the evidence.

The court below charged the jury: "This is an action brought by one of the legatees, devisees, under the alleged will of J. S. Efird, to test the validity of the will. Under the law any party who is a legatee or devisee or interested in the estate of a party who has made a will, or attempted to make a will, has a right to file what is known in law as a 'caveat' to that will, which simply means an objection to the validity of the will, and in this instance the caveator files the caveat and alleges that this will is invalid because of the fact—he alleges—that the testator did not have sufficient mental capacity to make this will."

This and similar instructions are made the basis of assignments of error by the caveator, on the ground that "these instructions withdrew from the consideration of the jury the question of undue influence." In our opinion, there was no sufficient evidence to be submitted to the jury by the court below that there was any undue influence on the part of anyone.

It is held *In re Craig,* 192 N. C., p. 657: "This Court has intimated in cases of this kind that it is a better practice to submit separate issues

relating to mental capacity and undue influence. *In re Rawlings' Will,* 170 N. C., 58." *In re Herring,* 152 N. C., p. 258; *In re Johnson,* 182 N. C., p. 526.

There was no issue submitted to the jury as to undue influence. The caveator neither requested nor tendered such an issue. Requested no prayer for instruction as to undue influence. The examination of the witnesses on both sides of the controversy was directed to the testamentary capacity of John S. Efird to make a will. The case in the court below was not tried upon the theory that the paper-writing was procured by undue influence, but solely on the question of the testamentary capacity of John S. Efird to make a will.

It is said in *Shipp v. Stage Lines,* 192 N. C., p. 478, "A party is not permitted to try his case in the Superior Court on one theory and then ask the Supreme Court to hear it on another and different theory. *Warren v. Susman,* 168 N. C., 457." *Coble v. Barringer,* 171 N. C., p. 445; *Webb v. Rosemond,* 172 N. C., p. 848; *Cook v. Sink,* 190 N. C., p. 620; *Mfg. Co. v. Hodgins,* 192 N. C., p. 577; *Stone v. Milling Co., ibid.,* p. 585; *Booth v. Hairston,* 193 N. C., p. 278.

*In re Hurdle,* 190 N. C., p. 224, the principle of undue influence is stated thus: "To constitute 'undue influence,' within the meaning of the law, there must be something operating upon the mind of the person whose act is called in judgment, of sufficient controlling effect to destroy free agency and to render the instrument, brought in question, not properly an expression of the wishes of the maker, but rather the expression of the will of another. 'It is the substitution of the mind of the person exercising the influence for the mind of the testator, causing him to make a will which he otherwise would not have made.' In short, undue influence, which justifies the setting aside of a will, is a fraudulent influence, or such an overpowering influence as amounts to a legal wrong. *In re Mueller's Will,* 170 N. C., 28; *Plemmons v. Murphy,* 176 N. C., p. 671; *In re Craven's Will,* 169 N. C., 561. It is close akin to coercion produced by importunity, or by a silent, resistless power, exercised by the strong over the weak, and which could not be resisted, so that the end reached is tantamount to the effect produced by the use of fear or force. To constitute such undue influence it is not necessary that there should exist moral turpitude, but whatever destroys free agency and constrains the person, whose act is brought in judgment, to do what is against his or her will, and what he or she otherwise would not have done, is a fraudulent influence in the eye of the law. *In re Lowe's Will,* 180 N. C., 140; *In re Abee's Will,* 146 N. C., 273." *Marshall v. Flinn,* 49 N. C., 199; *Wright v. Howe,* 52 N. C., 412; *In re Peterson,* 136 N. C., 13; *In re Parker's Will,* 165

---

N. C., 130; *In re Cross' Will*, 173 N. C., 711; *In re Bradford*, 183 N. C., p. 4; *In re Stephens*, 189 N. C., 267.

It is contended by caveator: "Mr. Efird, aged, infirm and worried, consulted with his wife, and upon her assurance that the document would be satisfactory to her, signed it. At the time of signing it, he had been in consultation with his attorney. He was not able to complete the document, on account of his physical and mental exhaustion. The document, while he was in that condition, was drawn by his regular attorney in such manner as to give this attorney indefinite and almost unlimited control over Mr. Efird's property and his descendants for an indefinite and unlimited length of time. What is, or is not, undue influence, must be determined by the condition of the person upon whom the influence is exercised and the relations between the parties; and where, as in this instance, a man is old, feeble and infirm, and his attorney writes a document giving to that attorney great profit and power, it is for a jury and not a judge to determine to what extent this influence was controlling; the relations between the parties raising a presumption of fact to be rebutted or explained by other evidence."

John S. Efird was in his sixty-ninth year when the paper-writing in controversy was executed, on 20 August, 1926. Bertie E. Efird, his wife, testified: "I heard him say he felt better at times than he had for fifteen years. The condition of his mind during this period was good, and I never heard him make any complaint about his inability to collect his thoughts, about his loss of memory; I never saw any evidence of mental decline. I don't remember the date, whether it was during the latter part of July, 1926, but Mr. Efird had a conversation with me with reference to making a will, and *he got books on making wills*. He did not say that the Wachovia Bank and Trust Company had sent him a copy of Mr. J. W. Cannon's will. *He and I would study and read the books together*, but I did not see Mr. Cannon's will at that time."

R. L. Smith, a practicing attorney in Albemarle since 1897, testified that he was his personal attorney since 1903. The first service was in regard to the administration of his father's estate about 1904. He was constantly off and on in communication with him. "On or about a little before August, 1926, Mr. Efird consulted me with reference to drafting his will. This consultation took place in my office. Mr. Efird phoned for an engagement; said he wanted to see me on a matter of business, and I designated the time when he could come, and he came to my office, I think the first time in the afternoon. That was in August, 1926, either the 18th or 19th, I can't be positive as to which day it was the will was drawn up—the will was signed on the 20th, and it was in process for I know more than one day, perhaps two days." Mr. Smith further testified that John S. Efird stated in detail to him what he wanted put in

his will. He had a tablet and made notes, going thoroughly into the matter as to what he wanted. It was then gone over with Mr. Efird, and he asked that a rough draft be made and to be submitted to him, which was done. The rough draft was produced on the trial of the issue (propounders' exhibit 2), as was also the paper-writing in controversy (propounders' exhibit 1).

Bertie E. Efird, the wife, testified (continued) as follows: "I remember the time he came home and showed me the will he had executed. The paper you show me marked 'Propounders' Exhibit One' looks like the paper Mr. Efird showed me, and it was signed by Mr. Efird, witnessed by those three gentlemen. I think it was on Saturday afternoon between 2 and 3 o'clock that he showed me the will; he had been up town since lunch and came back with it. He handed it to me and said, 'Here is a paper.' I opened it. I knew what it was, because I knew he was having it made, *because he told me he had been to Mr. Smith to write it*. I was lying down when he handed it to me, and opened it and read it, and *he asked me to read it aloud, which I did*. I certainly did read it loud enough for him to hear it and *read it over by sections and paragraphs*. When I got through reading it, Mr. Efird asked me if I was satisfied. I read that part where he made reference to me, and he asked me if I was satisfied, and I answered *that I was satisfied with my part;* I was satisfied with all of it, but I had nothing to do with it. I knew what he was asking about when he asked me if I was satisfied. He told me before that time that I would be cared for and have things as I wanted them. After I told him I was satisfied with it, I handed it back to him, and he handed me the Cannon will, and I read that; that is when I saw it. He did not specially say anything about the Cannon will in connection with his will. The mental condition of my husband at that time was good, and I could not tell any difference in his mental condition with what it had always been. I believe he had mind enough to make a will and know what he was doing. After he made the will he took a trip to the mountains. When I came to this clause in the will with reference to the one-fifth of his estate he set apart for charity and other purposes, he told me he had to designate it later by a codicil; he said perhaps he wanted me to help him study about where to put it—of course he knew where he wanted to put it, but in the way."

A. H. Eller testified that he was trust officer and vice-president of the Wachovia Bank and Trust Company; had known John S. Efird for twenty years. The Wachovia Bank and Trust Company held some stock in the Efird Manufacturing Company, in trust. Mr. Efird was its president. He attended the July, 1926, stockholders' meeting, at which Mr. Efird presided. "After the meeting of the stockholders was concluded I did not attend a meeting of the directors. After the meet-

ing of the stockholders, Mr. Efird shook hands with me, and he walked out of the directors' room or stockholders' room with me, and *introduced the subject of having in mind the preparation of his will at an early date,* and asked me certain things. He said his purpose was to put his estate in trust. He asked me something with reference to the appointment of executors and the appointment of trustees as being the same or different, and something of the usual commissions in the settlement of estates, and said that he wanted the Wachovia Bank and Trust Company as a trustee, without indicating anything about how many trustees he wanted, and said that he might call on me, might want to call on me to advise him further about his will, *and he told me that Mr. R. L. Smith was his lawyer and that he would have him to prepare his will,* and that he wanted to get it done some time quite soon. . . . He said something to me about why he wanted to have trustees appointed; he told me he had the controlling stock; that he had control of the stock of his own mill, and desired to hold the control through the means of trust—the voting power. I can't say he said why he desired to hold the control. He asked me the terms of Mr. J. W. Cannon's will; he said he had been thinking of trusteeing or disposing of his estate something in the manner Mr. Cannon had disposed of his, *and I think he indicated he would like to see a copy of Mr. J. W. Cannon's will.* I said to him, 'I can furnish you with that if you want it, if it will be of service to you; it is a public matter; we have it in our files, and if this will be of service I will send it to you,' and he said very cordially, 'Yes, I would like to have it, like to have you send it to me.' *In consequence I wrote him the following day, sending him a copy of Mr. J. W. Cannon's will.* . . . He asked me about the usual commissions. I said in substance, 'Commissions are either by the testator in his own way in the body of his will or it is controlled by the court under the law.' . . . I told him what Mr. Cannon allowed. I told him he had three trustees, and they were allowed three per cent on receipts and three per cent on disbursements, making six per cent of the income divided equally between three different trustees."

H. L. Horton had been connected with John S. Efird in the mills for about twenty-five years—bookkeeper, office manager, and later general work as secretary. "I had no conversation with Mr. Efird about his will other than *he told me it was being prepared by Mr. Smith, and later he put it out on his desk after it had been signed and said to me 'Horton, I have had it fixed up like I want it.'* A day or two elapsed between the two occasions. After he told me that he put it in the vault in his private drawer. He carried the key to that. After his death I got the key from Mrs. Efird and found its contents; his two sons, Watt (W. G.)

and Jap (J. J.) were with me when I found it. At the time he told me he was having that will prepared, and at the time he told me it had been prepared and signed, I am of the opinion Mr. Efird had sufficient mind and memory to know the nature and character and value of his property, who the natural objects of his bounty were, who had claims upon him, and what disposition he was making of his property by will."

It was in evidence from letters that John S. Efird, from 21 April, 1926, including 13 January, 1927, was purchasing various kinds of bonds and making inquiry through the Wachovia Bank and Trust Company; 21 April, 1926, in regard to purchase of $100,000 State of North Carolina 4½% bonds; 5 August, 1926, purchase $2,000 town of Albemarle 5½% water and sewer bonds; 13 January, 1927 (six days before his death), $25,000 Federal Land Bank 5's; 13 September, 1926, letter to J. P. Cook, chairman board of trustees Stonewall Jackson Training School, Concord, N. C.: "I am in receipt of your letter of the ninth instant, and take pleasure in handing you herewith my check for $1,000, amount of subscription toward the hospital fund. I trust that you will have no difficulty in getting others to subscribe to this fund, *as I consider it one of the most worthy causes in our State, and should appeal to our people who are in position to contribute thereto.* With personal regards, and with best wishes for yourself and the institution you represent, I am," etc.

In the rough draft the executors and secretary were left out, and in the final draft John S. Efird asked R. L. Smith if he would act with his two sons, W. G. and J. J. Efird. In regard to R. L. Smith being appointed trustee, he (Smith) testified: "He then asked me if I would serve as a third trustee, and *I told him I didn't desire to do so, had no desire to do it, but if he wanted me, as a friend, I would comply with his wishes.* He assigned as his reason for wanting me as a trustee that I was on the ground here, and on account of Mrs. Efird taking a lifetime support out of the will, rather than a child's part or dower, that he wanted me put in particularly to see that that provision of the will was amply provided with, or so that she could have some one she could consult with and look after her interest in the matter and call in the other trustees when necessary."

The compensation of the three executors of $1,000 each was reasonable. The three per cent commissions on the income derived from the trust estate and three per cent on the disbursements and distribution of the income to be divided equally between the three trustees and secretary, cannot be considered large. It was not an unnatural request to have his attorney, of long years standing, to act as one of the trustees. The control was not put in the attorney, but in three trustees. The

paper-writing does not give his attorney *indefinite and almost unlimited control* nor an *indefinite and unlimited length of time.* The control is in three and a time limit fixed.

The following cases are cited by caveator: *Amis v. Satterfield,* 40 N. C., 173; *Lee v. Pearce,* 68 N. C., 77; *McRae v. Malloy,* 93 N. C., 154; *In re Worth's Will,* 129 N. C., 223; *In re Everett,* 153 N. C., 83; *In re Fowler,* 159 N. C., at p. 208; *In re Mueller's Will,* 170 N. C., 28; *Brown v. Brown,* 171 N. C., 649; *Plemmons v. Murphey,* 176 N. C., 671; 40 Cyc., 1154 *et seq.* From an examination of these cases we do not consider them applicable to the facts of the present controversy. On the entire record, as heretofore stated, there is no evidence of undue influence sufficient to be submitted to a jury.

The court below charged the jury as follows: "In order that you may understand, gentlemen of the jury, the contentions of the parties and apply the evidence to their contentions, the court will instruct you what in law is understood and meant by 'testamentary capacity.' A man has a right, a person has a right, to make a testamentary disposition of his property by will, gentlemen of the jury, and the law doesn't require the highest degree of intelligence to make a will, and doesn't require that he has to have sufficient mental capacity to make a wise and judicious distribution of his property or disposition, but does require that he have sufficient mind and memory to understand the nature and extent of his property and to form a judgment as to the reasonable value thereof; that he have sufficient mind and memory to know the objects of his bounty—that is, the persons to whom he is seeking to give his property; his near relatives or those who would naturally expect to be recognized or remembered by him in the will. He must also have sufficient mind and memory, gentlemen of the jury, to understand and know what disposition he is making of his property, the manner of the disposition; in other words, he must understand the nature and the effect of the will and the disposition he is making of his property. Now the court charges you, when a man has that amount of mentality that he has the power and the right, under the law, to make a will. There is another requirement however, gentlemen of the jury, that is a statutory requirement. Notwithstanding the fact that he may have this testamentary capacity to make a will, the law requires that the will be in writing, it must be signed by the testator or by someone in his presence and at his request, and must be signed by at least two witnesses who signed it in his presence and at his request as his last will and testament." *In re Craven,* 169 N. C., 561; *In re Ross,* 182 N. C., 477; *In re Fuller,* 189 N. C., 509; *In re Creecy,* 190 N. C., 301, and cases cited. The charge is correct in law and the above authorities fully support it.

The next exceptions and assignments of error are to the charge of the court below, as follows: "So the court charges you in this case, gentlemen of the jury, that the burden of proof in this case is upon the caveator to prove to you by the greater weight of the evidence in this case that Mr. Efird on the twentieth day of August, 1926, did not have sufficient mental capacity to understand the nature and extent· of his property and the objects of his bounty and the disposition he was making of it. If he has failed to prove that by the greater weight of the evidence, then it would be your duty to answer this issue 'Yes,' and say it was the will of Mr. Efird because the burden of having to prove this to you and show it to you by the greater weight of the evidence is upon him. Now, gentlemen of the jury, on the other hand, if the caveator to this will had proved to you by the greater weight of the evidence that John S. Efird, on 20 August, 1926, did not have sufficient mind and mentality to know and understand the nature and extent of his property, the objects of his bounty and the disposition that he was making of his property by will, then the court charges you, if the caveator has proven that by the greater weight of the evidence, that it would be your duty to answer the issue 'No.' But the court charges you, gentlemen of the jury, on the other hand, if the caveator has failed to prove to you by the greater weight of the evidence that John S. Efird did not have sufficient mental capacity on 20 August, 1926, to make and execute his will, to understand the nature and extent of his property and the objects of his bounty and those to whom he was giving it, he has failed to so prove to you by the greater weight of the evidence, it would be your duty to answer this issue 'Yes,' because the law presumes he did have such mental capacity and the burden of proof is upon those attacking the will, and unless he has done that by the greater weight of the evidence, it would be your duty to answer this issue 'Yes.' "

Caveator contends: That the above and like instructions were error. The error "consists of the fact that his Honor placed the burden upon the caveator to show that Mr. Efird lacked in all three of the essential elements of testamentary capacity. This error was at no point cured in the charge, for his Honor instructed the jury that these were the elements of testamentary capacity and unless the caveator had established the absence, not of one but of all, they should answer the issue 'Yes.' A number of witnesses had testified that Mr. Efird was lacking in one, while possessing in two, or lacking in two while possessing in one, and the instructions complained of converted these witnesses into witnesses for the propounders. It is true that the law presumes testamentary capacity and a caveator must negative such capacity, but must do so only by negativing one of the elements of such capacity, and where an

alleged testator is lacking in any one of these three elements, the document is not in law a will."

The proposition is clearly stated, but not applicable here. The whole theory of the case, as tried in the court below, disclosed by the record, is to the effect that both caveator and propounders questioned their witnesses on the conjunctive proposition including all the elements as to the testamentary capacity of John S. Efird to make a will. For example, caveator's first witness, James W. Efird, brother of John S. Efird: "I was a stockholder in the Efird mill at that time. As to my brother's mental condition at that time, at the time he came down by the store—I can't tell about that; I said while ago he seemed very much worried. I do not believe that at that time, being so near to his sickness at Charlotte, that he had sufficient mental capacity to know who his relatives and persons having claims on him were, to understand the nature, extent and value of his property and to understand the conditions of this paper-writing and the disposition he was making of his property."

These conjunctive elements were the basis and bed-rock of the contest. The disjunctive attitude of the caveator's witnesses were fragmentary. No prayer for instructions were requested on the fragmentary disjunctive attitude.

The court below charged the theory in accordance with the consistent questions to the witnesses on both sides as to the testamentary capacity including all elements of John S. Efird to make a will. Then again, the fragmentary evidence, on the whole record, on the disjunctive proposition, is weak and vacillating. The fact that in the opinion of one of the caveator's witnesses, "I don't fully understand it myself." For example, again: "I don't think I have sworn he didn't have sense enough to make a will. I said I didn't think he understood the document." Dr. C. M. Lentz, the only physician examined for caveator, who got him to endorse a note in September "talked intelligently about that." . . . "I can't form an opinion as to whether he understood that will or not."

As set forth, the court below, in the beginning of its charge, properly defined testamentary capacity. From this charge the jury could easily understand that the paper-writing was not a valid will if any of the elements of such capacity was lacking.

Construing the charge, as a whole, in the light of the evidence, we cannot hold there was reversible or prejudicial error. Under the facts and circumstances of this case the error was technical, harmless. The jury could not have been misled and it could not have affected the result.

*In re Edens,* 182 N. C., p. 400, the principle is well stated thus: "The other evidentiary exceptions, or those relating to the Court's

rulings on the questions of proof, are not sufficiently meritorious to warrant a reversal or new trial. Verdicts and judgments are not to be set aside for harmless error, or for mere error and no more. To accomplish this result, it must be made to appear not only that the ruling was erroneous, but that it was material and prejudicial, amounting to a denial of some substantial right. *Cotton Mills v. Hosiery Mills,* 181 N. C., 33; *S. v. Smith,* 164 N..C., 475; and *Cauble v. Express Co.,* 182 N. C., 448." *In re Ross,* 182 N. C., 477; *Dickerson v. R. R.,* 190 N. C., 292; *Harvey v. Tull,* 192 N. C., 826; *Power Co. v. Taylor,* 194 N. C., 231. Frequently the courts, under similar situations, have held "and" to mean "or," but the error is technical and harmless on the present record.

We think the last point made by caveator is also untenable. On the entire record, if error, it was harmless and technical. The minor errors that creep into a long trial, if not prejudicial, should be ignored.

For the reasons given, in the judgment of the court below there is

No error.