The issues submitted to the jury and their answers thereto were as follows:
"1. Was the deceased, McD. Bergeron, of sound and disposing mind and memory at the time of the execution of the paper-writing offered for probate? Answer: Yes.
2. Was the paper-writing offered for probate procured to be executed by undue influence, as alleged? Answer: Yes.
3. Is the paper-writing offered for probate and every part thereof, the last will and testament of the said deceased? Answer (by consent): Yes."
Upon the coming in of the verdict, the second issue appearing in the record was set aside by the judge as a matter of law on the ground of want of evidence to support the same.
The judgment of the court below, in part, is as follows: "Upon the verdict of the jury upon the issue as to mental capacity in favor of propounders as appears in the record, it having been heretofore consented that the court should answer the third issue upon the basis of the jury's verdict, and the court having answered said issue that the paper-writing offered in evidence and every part thereof is the last will and testament of the said McD. Bergeron, `Yes,' it is further ordered, decreed and adjudged that the said paper-writing be and the same is hereby declared to be the last will and testament of the said McD. Bergeron, and is hereby admitted to probate in solemn form. The motion of caveator to set aside the verdict on the first, or mental capacity issue, is denied."
The other material facts and assignments of errors will be set forth in the opinion.
Briefly, some of the evidence bearing on the issues:
The alleged will of McD. Bergeron was signed by him on Friday evening, 10 December, 1926, about dark, a light was in the room. He was sitting up in bed propped up against the bedstead in his room, where he lived alone, above his store at the time he signed the alleged *Page 651 
will. It was prepared from a memoranda made by one C. G. Ellis, who had an attorney prepare the alleged will, who brought it to Bergeron's room prior to his signing. It took the attorney about thirty-five minutes to write the will, which was done immediately after Ellis handed the attorney the memoranda that evening, and then taken to Bergeron's room by the attorney. John G. Cross was there at the time. It was read to Bergeron and he said it was what he wanted, and the attorney said he and the other witness, John G. Cross, signed it at Bergeron's request. John G. Cross testified that Ellis came down and met him on the street and told him Bergeron wanted him to go up and witness his will. That Ellis was the man that asked him to sign Bergeron's will. Besides the attorney and Cross, the witnesses to the alleged will, the only other person in the room was Ellis, the executor named in the will.
J. L. Hofler testified: "Friday about dark (about the time the alleged will was signed), Mr. Ellis came to me and said Mr. Bergeron wanted to know if I would hold up to my original offer of 65 per cent (on his stock of goods). It took me by surprise. As a result of that conversation, I saw Mr. Bergeron and bought the goods that same night. Friday night we immediately began taking inventory. I did not confer with Mr. Bergeron before taking inventory. I made the deal through Mr. Ellis." The check was given Mr. Ellis.
Bergeron was about 58 years old and had been sick a good deal that fall and had been away for his health. There was marked evidence of a decline in health and he was "bad off" in September. He had swelling in his feet and ankles and had a leaking heart. On the morning of 9 December, about 9 o'clock, it was discovered that Bergeron was ill in his room, the door was broken open and he was found lying with one foot off the bed in an unconscious condition. It was in evidence, on the part of the caveator, that on that day he was too low to talk. Late in the evening next day, about the time the paper-writing was signed, he was in pretty bad shape. At that time he was in such a condition that he did not have mind enough to know his different relatives and his relation to them and the scope and effect of making a will of the property he had. He didn't look like he had mind for anything. A witness, H. C. Rountree, testified as to his condition late in the afternoon of the 10th, about the time the alleged will was signed: "I didn't talk to him, but he looked to me like he was a dead man. I would just go and see him and wouldn't try to talk to him in the condition he was in. The impression his condition made on me with respect to his life, was that when I would go there he would be lying there like somebody dead all the times I saw him. I have seen him propped up in bed and one time I asked him how he was feeling and he said he didn't know. . . . As to my having had enough opportunity to have an opinion satisfactory *Page 652 
to myself as to whether he had mind enough to know what he was doing, I don't think he had any at all."
John Baines testified: "His condition Friday night was bad (at the time the alleged will was signed). He didn't talk to me. He may have talked to others. I just stood and looked at him a minute or two and went back. He was always sleeping, or looked like it when I went up there, but you could speak to him and he would open his eyes and go right back again. That was as late as Friday night."
There was evidence, on the part of propounders that Bergeron had mental capacity to make a valid will, and there was no undue influence exerted.
On Tuesday, 21 December, Bergeron was taken to his nephew's home in Pitt County, and died there on the night of the 22d — twelve days after the alleged will was made.
McD. Bergeron was married on 31 January, 1900, to Mary Shaw, in Washington, N.C. and lived with her about two years. There was born of the marriage one child on 15 November, 1900. She is some 28 years old, is married and is the caveator in this proceeding — Mary E. Hudgins. Mary Bergeron brought an action and obtained a divorce against McD. Bergeron on the grounds of abandonment and nonsupport. She took the child and raised her. She lived in Washington, N.C. Norfolk, Va., and now lives with her daughter and her husband in New Jersey. McD. Bergeron, the father, contributed nothing to the child's support after the separation, but the entire burden was on the mother. The alleged will of McD. Bergeron left his property to his niece and nephews.
The court below set aside the findings of the jury on the second issue on the ground of insufficient evidence, as a matter of law, and gave judgment for the propounders.
In Lumber Co. v. Branch, 158 N.C. at p. 253, the law is thus stated: "It is settled beyond controversy that it is entirely discretionary with the court, Superior or Supreme, whether it will grant a partial new trial. It will generally do so when the error, or reason for the new trial, is confined to one issue, which is entirely separable from the others, and it is perfectly clear that there is no danger of complication. Benton v.Collins, 125 N.C. 83; Rowe v. Lumber Co., 133 N.C. 433." Whedbee v.Ruffin, 191 N.C. at p. 259.
The court having submitted the issues appearing above, charged the jury thereon and stated the contentions of the parties, to which there was no exception, except to that part of the charge in which the court read the following from 28 R. C. L., sec. 44, page 94, concerning old age and disease in the making of a will, to wit: "Mere old age, physical weakness and infirmity or disease, or even extreme distress and debility of the *Page 653 
body are not necessarily inconsistent with testamentary capacity, but such facts are admissible in evidence to aid the jury in determining whether or not the testator had sufficient capacity at the time of making his will. The circumstance that a testator at the time of executing his will is suffering from acute pain or is on his death bed does not take away his testamentary capacity (of itself). A person who is blind may make a will as may one who is deaf and dumb. Where a testator's sickness is whollyphysical, proof of his condition as to lethargy, suffering orunconsciousness on days preceding or following the execution of a will isentitled to very little consideration. The powers of the mind may beweakened and impaired by old age and bodily disease without destroying thetestamentary capacity and mere mental weakness not due to mental disease,but solely to physical infirmity does not constitute mental unsoundness,and the courts will scrutinize efforts by witnesses to infer mentalweakness or insanity from mere physical decrepitude. It has been said however that weakness of intellect sufficient to negative such capacity may be traceable to old age, disease and bodily infirmity. To an aged person as well as one in the prime of life the usual test as to testamentary capacity will be applied, as for example, whether the testator knows the amount of his property and the natural objects of his bounty, and understands what he is doing (when he disposes of his property and makes his will). The law prescribed no limit in point of age beyond which a person cannot dispose of his property by will. (Nobody in North Carolina can make a will unless twenty-one years of age.) On the contrary it has been justly said that thewill of an aged person should be regarded with great tenderness when itappears not to have been procured by fraudulent means, but contains thosevery dispositions which the circumstance of his situation and the course ofnatural affections dictated."
The caveator excepted and assigned error to the above part of the charge in italics.
We have a statute which has been in force in this State since 1796, as follows: "C. S., 564. No judge, in giving a charge to the petit jury, either in a civil or a criminal action, shall give an opinion whether a fact is fully or sufficiently proven, that being the true office and province of the jury; but he shall state in a plain and correct manner the evidence given in the case and declare and explain the law arising thereon."
There are expressions in the charge which we cannot sustain: (a) "Where a testator's sickness is wholly physical, proof of his condition as to lethargy, suffering and unconsciousness on days preceding or following the execution of a will is entitled to very little consideration." The weight and consideration was for the jury and not the court to determine. (b) "And the courts will scrutinize efforts by witnesses to *Page 654 infer mental weakness or insanity from mere physical decrepitude. On the contrary it has been justly said that the will of an aged person should beregarded with great tenderness when it appears not to have been procured by fraudulent means, but contains those very dispositions which the circumstances of his situation and the course of natural affections dictate." In this jurisdiction, the jury find the facts in issue, upon the weight of the evidence, as the case may be, not on tenderness or great tenderness, nor on passion, prejudice or sympathy. The oath of the jurors: "And true verdicts give according to the evidence, so help you God." It was for the jury, and not the court, to scrutinize efforts by witnesses to infer mental weakness or insanity from mere physical decrepitude.
From the evidence adduced on the part of the caveator, and from the facts and circumstances of the case, the portions of the charge objected to, on the whole, were prejudicial and reversible error. They impinged the above statute that no judge "shall give an opinion whether a fact is fully or sufficiently proven." In this jurisdiction, the court interprets the law and the jury ascertains the facts — the wall between the two is impenetrable. S. v. Sullivan, 193 N.C. 754. See annotations under C. S., 564, N.C. Code 1927, Michie. It is not so in all jurisdictions. The questions of mental capacity and undue influence in making wills have recently been fully discussed by this Court. See In re Will of Creecy,190 N.C. 301; In re Will of Brown, 194 N.C. 583; In re Will of Efird,195 N.C. 76. For the reasons stated there must be a
New trial.