This was an action brought by plaintiff against defendants, to recover damages: (1) For washing a bridge away. (2) For loss of timber that could not be marketed on account of the bridge being washed away. The defendant set up the plea of contributory negligence. The issues presented to the jury and their answer thereto was as follows: "(1) Was the plaintiff's bridge destroyed by the negligence of the defendant, as alleged in the complaint? Answer: Yes. (2) Did the plaintiff, by its own negligence, contribute to the destruction of said bridge, as alleged *Page 517 
in the answer Answer: No. (3) Was plaintiff delayed by reason of the destruction of said bridge in the completion of its timber boundary on Deep Creek and Laurel Branch, as alleged in the complaint? Answer: Yes. (4) What damages, if any, is the plaintiff entitled to recover? (a) For the cost and expense of replacing the bridge in question ? Answer: $1,800. (b) For profits lost by reason of the delay caused by the destruction of the bridge? Answer: $6,200."
The court below rendered judgment on the verdict. The defendant made numerous exceptions and assignments of error and appealed to the Supreme Court. The material ones and necessary facts will be set forth in the opinion.
At the close of plaintiff's evidence and at the close of all the evidence, defendant made motions for judgment as in case of nonsuit, C.S., 567. The court below overruled these motions and in this we can see no error.
Is is too well settled in this jurisdiction to cite authorities that on motion to dismiss or judgment as in case of nonsuit, the evidence is to be taken in the light most favorable to plaintiff and he is entitled to the benefit of every reasonable intendment upon the evidence and every reasonable inference to be drawn therefrom. An exception to a motion to dismiss or judgment as in case of nonsuit at the close of plaintiff's evidence and renewed by defendant after the introduction of his own evidence, does not confine the appeal to the plaintiff's evidence alone and a judgment will be sustained for plaintiff if there is any sufficient, competent evidence on the whole record to warrant plaintiff's recovery. The evidence favorable alone to plaintiff is considered. The competency, admissibility and sufficiency of evidence is for the court to determine, the weight, effect and credibility is for the jury.
The allegations in plaintiff's complaint, in part, are as follows: "That on the morning of 3 September, 1928, defendant negligently used and operated its said dam and water gates thereon in such a reckless and imprudent manner and caused and allowed a large, excessive, dangerous and destructive volume of water to be suddenly released and discharged from its said dam with such an excessive and terrific waterhead and current below the dam, filling the channel and covering the territory there below, carrying logs, timber and debris and waste with excessive volume and velocity and force which struck the plaintiff's aforesaid railroad bridge, destroying and washing the same away." *Page 518 
The defendant denied this allegation and set up contributory negligence in that: (1) It erected the railroad bridge across the Cheoah River, two or three feet or more below the high water mark. (2) Plaintiff cut logs on the Cheoah River above said bridge and tore down trees and allowed the trees, logs and laps to be in or near the river and at flood or high tide, were carried down the river and lodged against the bridge and the force of the stream against the debris caused the bridge to give way and wash out.
The principle of law involved in this controversy is thus stated in Coulson Forbes on Waters and Land Drainage, 5th Ed., pp. 143 and 144: "The general principle regulating the liabilities of landowners, with regard to the escape and overflow of water, seems to be as follows: Where the owner of the land, without wilfulness or negligence, uses his land in the ordinary manner of its use, though mischief thereby accrues to his neighbor, he will not be liable for damages; but where for his own convenience, he diverts or interferes with the course of a stream, or where he brings upon his land, water which would not naturally have come upon it, even though in so doing, he acts without wilfulness or negligence, he will be liable for all direct and proximate damages, unless he can show that the escape of the water was caused by an agent beyond his control, or by a storm, which amounts to vis major, or the act of God, in the sense that it is practically, if not physically, impossible to resist it." Kelly v. Lett,35 N.C. 50; Comrs. v. Jennings, 181 N.C. 393 (399); Jackson v. Kearns,185 N.C. 417; Winchester v. Byers, 196 N.C. 383.
The jury answered the 1st and 2d issues in favor of plaintiff and assessed the damage at $1,800. The defendant contends that there was no sufficient competent evidence to support the finding of the jury on the 1st issue. We cannot so hold. The evidence on the part of plaintiff was to the effect that the defendant constructed a large concrete dam about 214 feet in height across the Cheoah River in Graham County, North Carolina, known as the "Santeetlah Dam." It closed said dam and obstructed and impounded the waters of the said Cheoah River and its tributaries and above, creating a lake or reservoir of water of great volume and magnitude which has a shore line of about 110 miles and covers an area of about 3,000 acres of land. In the construction of its said dam, the defendant undertook to install or place as a part thereof what it terms as water or flood gates, which gates are movable and can be raised or lowered, obstructing or releasing the waters from the said lake by such action.
There are eight gates on the "Santeetlah Dam," they are 12 feet high and 24 or 25 feet wide. These gates are raised or lowered by hand power, with a worm gear. It requires about 5 minutes to raise *Page 519 
one of the gates 12 inches. About 7 1/2 miles below the dam on the Cheoah River, the plaintiff built a bridge about 12 or 14 feet above the ordinary tide in the river and ran trains over it to get lumber from its holdings. The river, at this bridge, is about 150 feet wide. The bridge was 156 feet long and was built 3 1/2 to 7 feet above the high water mark and cost from $2,500 to $3,000. The following are some of the witnesses who testified, in part, for plaintiff. J. C. Crisp: "We went to the yard a short distance below Tapoco, and picked up the train and drove up to Barkers Creek bridge, and we got there between 7 and 8 o'clock. . . . We drove up to the bridge and set the train out on the main line. When we got to the bridge, we could see the water coming up rapidly, and in a few minutes the bridge went out. It broke from the opposite side of the river from where we were, and almost sprung the steel out from under the engine. When we got to the bridge, the water was around the stringers. It was about 2 1/2, or 3 feet from the bottom of the stringers to the top of the bridge. The water rose from 2 to 3 feet in from 5 to 10 minutes, in my opinion: I could see it rising; we had been there only from 5 to 15 minutes before the water was running over the bridge and washed it out. There is no other lake or dam on any of the streams above that bridge other than the Santeetlah Dam. . . . It was not raining that morning. The streams above the dam were up some on Sunday evening, just an ordinary tide. It quit raining Sunday evening about 6 o'clock; if it rained any more during the night, I was asleep and didn't hear it. . . . There was one empty gondola on the bridge, near the east side. We pulled it off and it was right soon after we pulled off the car that the bridge went out. . . . The drift collected on the east side, it consisted of brush and such timber as will collect along any stream, where there is logging operation. . . . It was ready for operation in two weeks. When I came back, we worked continually loading logs, and shipped out 6 to 8 cars a day. A car would average 6,000 to 8,000 feet; our daily shipment was from 40,000 to 50,000 feet."
W. C. Farley: "We were there not over 20 minutes before the bridge went out. The water rose right now, it rose awful fast, it rose rapidly."
Luther Hamilton: "While we were there, the water went from the bottom of the stringers over the top of the stringers, in about 10 or 15 minutes. . . . After we got there it wasn't very long before the tide came along. We could tell by the drifts and the trestle timber and stingers and cross-ties. It was traveling at a pretty good speed."
Lee Herren: "I crossed the Cheoah River between the dam and the bridge, on Monday morning about 5 or 5:30 o'clock. I forded on horses — some forded and some went across in a boat — I rode one horse *Page 520 
and led another, each teamster did. That was about 5:30 on the Monday morning they said the bridge washed out. . . . We crossed about four or five miles below the dam. . . . The horses waded the river that morning, didn't swim."
Clarence Adams: "I know where the Santeetlah Dam is, and I also know the bridge of Kitchen Lumber Company across the Cheoah River below the dam. . . . On the first Monday in September, 1928, I observed a sudden rise in Cheoah River, I was something like 50 yards from the river. I first heard a noise, just a roaring. I and a man by the name of Stewart were working together, and one of us said something about the noise, I turned and looked up the river and saw coming down the shoal a head of water, it looked like a splash let loose, it all came together. It looked to me like when I saw it, it must have been three or four feet high, higher than the water just below it. It looked like it came rolling."
Will Stewart: "On the first Monday in September, 1928, I was working with Clarence Adams at the mouth of Yellow Creek, about 50 yards from the river. We heard a noise of the water coming down the Cheoah River, just a roaring noise; just a head of water coming rolling. It was coming pretty good speed. I don't know anything about the Kitchen bridge, I think it was about 4 miles below where we were working. . . . We saw that tide about 7:30, it was about 2 or 2 1/2 feet high."
Loss Holland: "I heard a roaring in the Cheoah River that morning and looked and saw something like a splash of water coming down the river."
J. B. Buchanan: "There was no other practical way of getting this timber out of Barkers Creek and Bear Creek, except over the railroad. We were moving about 50,000 feet per day over the railroad trestle at the mouth of Barkers Creek when it washed out. . . . We began getting the timber for rebuilding the bridge the same day on Bear Creek and hauled it up to the bridge with the train. On Wednesday evening, a week after the trestle washed out, I let the supply train over there one night late, and the best I remember, we didn't put any logs over until Monday, two weeks after the bridge washed out. The best I can remember, during that time the weather was fine. We could have transported 50,000 feet per day over the bridge during these two weeks if the bridge had been there. . . . This bridge was washed out on 3 September, 1928, and we kept cutting and logging in that territory until 15 November, 1929."
E. S. Miller: "It cost us $2,153.44 to replace the bridge that washed out: I think that was a reasonable cost. . . . We lost about 12 *Page 521 
days on account of the bridge being out. . . . Q. Mr. Miller, if you know, about what was it costing the Kitchen Lumber Company during the months of August and September, 1928, to ship this timber, everything that was done — cutting and delivering and shipping this timber — the average cost? Answer: $14.21 per thousand. . . . Q. What, if you know, was the average profits on that timber per thousand during these two months? Answer: The average selling price for August and September was $24.54. . . . Q. How much profit would that leave the Kitchen Lumber Company ? Answer: The profit was $10.33. . . . Q. That covered the time the bridge was out ? Answer: It did. . . . We had sufficient equipment and sufficient force to keep the trains running had the bridge not been washed away."
Ed Turbeyville, a witness for defendant, who was caretaker at Santeetlah Dam, testified to the heavy rainfall and also: "The water continued to rise and at 4 p.m. I raised this gate another foot. The total opening of the gates was 7 feet — 4 feet on the first and 3 feet on the second. With this amount of gate opening, the water in the lake kept rising. I didn't raise the gates any more until midnight, Sunday night. At that time, the water was still rising and I raised this gate another two feet. This gave a total gate opening on both gates of 9 feet. I slept from midnight, Sunday night, until Monday morning. I saw the dam again at 6 a.m. central time Monday morning, 3 September. That would be 7 o'clock eastern standard time. At that time, the water had risen an additional twenty-five hundredths of a foot from 12 o'clock Sunday night. This additional water was going over the top of the gates that had not been raised. At 6 a.m. central time, I raised the gates an additional four feet. It took me 20 minutes to raise the gate. This gave a total opening of 13 feet on the three gates. This opening did not reduce the height of the water. At eight o'clock central time the gauge showed the water was standing still. There had been no fall. At 9 o'clock central time, I raised another gate four feet. That started pulling the dam. I have crossed the fords between the Santeetlah Dam and the Kitchen Lumber Company's bridge. I would say you would be lucky to ford with horses with two feet gate opening. At midnight Sunday night, there was nine feet of gate opening. The gates remained at that height until six o'clock central time, Monday morning (3 September)."
On cross-examination: "At 6 o'clock, Monday morning, I raised another gate four feet. I did not phone anybody to look out. I knew they were not going to get into that deep water. They might see the water coming. I don't know if they could hear it coming. When I raised the additional four feet, I phoned the operator at the *Page 522 
powerhouse at the Santeetlah plant and gave him the gate opening. . . . The lake was full and running over when I raised the gate four feet. It was running over the other gates."
The velocity of the water when it left defendant's dam and the time it took to reach plaintiff's bridge was for the jury to determine. A fact can be proved by both circumstantial and direct evidence. The evidence was sufficient to be submitted to the jury. The finding of the jury on the first and second issues cannot be disturbed. In re Will of Bergeron,196 N.C. 649 (652). The charge of the able and learned judge in the court below is not in the record, the presumption is that he charged correctly the law applicable to the facts. The serious question that confronts us in the trial on the 3d issue and the assessment of damages for delay by reason of the destruction of the bridge, on the 4th issue. (b.)
The delay in rebuilding the bridge was 14 days — 12 working days. The lumber hauled each day prior to the bridge washing away, according to plaintiff's witnesses, was about 40,000 to 50,000 feet at a profit of $10.33 a thousand feet. The jury has given the full amount of profit on a basis of about 50,000 feet a day, yet plaintiff had this, some 600,000 feet of lumber on hand. Plaintiff introduced evidence that in the time limits and contracts, it could not get its timber out. In Johnson v. R. R,140 N.C. 574, the principle is laid down: Where the profits lost by defendant's tortious conduct, proximately and naturally flow from his act and are reasonably definite and certain, they are recoverable; those which are speculative and contingent, are not.
The defendant contended that to rebut this evidence: "The court erred in refusing to allow defendant's witness, C. W. Hodge, to answer the question: `When did you begin to take up the railroad, you remember?' Witness, if permitted to answer, would have stated: `About the middle of April, 1930'; for that, the plaintiff had offered evidence that it quit work about the middle of November, 1929, this evidence being offered for the purpose of showing that plaintiff could have continued operating until the railroad was taken up and thus have removed all of its timber."
We think this exception and assignment of error is well taken. On the 1st and 2d issues, we find no error. On the 3d issue and the second part of the 4th issue (b), there must be a new trial.
No error on 1st and 2d issues.
New trial on 3d issue and second part of the 4th issue (b). *Page 523