Marvin J. FROCKT, Plaintiff,

v.

Max H. GOODLOE, Jr., Max H. Goodloe, Carl S. Albis, Sr., Carl S. Albis, Jr., Carl S. Albis, Jr., d/b/a A.G.A. Group, a Virginia General Partnership d/b/a the Comfort Inn of Dunn, North Carolina, Defendants.

No. C–C–86–344–P.

United States District Court, W.D. North Carolina, Charlotte Division.

Sept. 21, 1987.

Gary S. Hemric, J. Mitchell Aberman, Mark T. Calloway, James, McElroy & Diehl, P.A., Charlotte, N.C., for plaintiff.

Robert C. Bode, Bode & Dickinson, Richmond, Va., Thomas L. Nesbit, Womble, Carlyle, Sandridge & Rice, Winston-Salem, N.C., for defendants.

## MEMORANDUM OF DECISION

ROBERT D. POTTER, Chief Judge.

THIS MATTER came on to be heard before this Court on August 31, 1987, on Defendants' Motions for summary judgment and for partial summary judgment. The undisputed facts are that Plaintiff, a traveling jewelry salesman, checked into a Comfort Inn ("Inn") owned by a partnership of which Defendants are all of the general partners. Plaintiff had in his possession a jewelry sample case which had the appearance of a common attaché case. The case contained approximately $150,000 worth of gems and jewelry. (Defendants have not admitted the value of the jewelry contained in the case; however, there is no evidence to controvert Plaintiff's evidence of the value of the jewels, and it is immaterial for the purposes of this Order.)

Plaintiff requested that the case be placed in a safe provided by the Inn. The desk clerk accepted the case for safekeeping, agreeing either to put the case in a safe or to place the case in a closet wherein was kept the Inn's petty cash. Plaintiff did not inform the clerk that jewels were contained in the case or that the case was worth a specific dollar amount; however, Plaintiff did state that the case was "very valuable." The clerk did not offer Plaintiff a receipt for the case, so Plaintiff wrote out, in duplicate, his own

receipt. One copy was attached to the case; Plaintiff retained the other.

When Plaintiff called for the case the next day, it could not be located. The case was never recovered. Plaintiff brought suit seeking to recover from the Inn the full value of the case and its contents plus the profits Plaintiff lost as a result of not having his sample case for approximately two weeks.

The jewelry in the case was owned either by Plaintiff's employer, Buddy Frockt & Associates, or by his employer's partner, Rothblum & Mire, Inc. Under the terms of a Consignment Agreement, executed by and between Plaintiff and his employer when the jewels were given to Plaintiff, Plaintiff remained responsible for the jewels while they were in his possession. Because the jewels were insured while they were in Plaintiff's possession, Plaintiff was actually called upon to pay his employer only approximately $6,300.00, representing the deductible on the insurance policy plus incidental expenses, as a result of the jewels being lost while in Plaintiff's possession.

Defendants moved for summary judgment on the ground that Plaintiffs and the Inn contractually agreed to exonerate the Inn from any liability whatsoever for damage to or loss of Plaintiff's property while he was a guest at the Inn. Defendants also moved for partial summary judgment, contending that Plaintiff was not the proper party to recover for the full value of the jewels and that Plaintiff could not recover for lost profits resulting from his not having the sample case.

Having examined the evidence and arguments presented by both parties, this Court is of the opinion that Defendants are not entitled to summary judgment on the basis of the alleged exculpatory agreement, but Defendants are entitled to a partial summary judgment in their favor on the question of Plaintiff's recovery of lost profits.

## I. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

An innkeeper's duties and liabilities to its guests are governed by N.C.Gen.Stat.

§§ 72–1 to 72–7 (1985). Concerning the safekeeping of valuables, N.C.Gen.Stat. § 72–3 states:

It is the duty of innkeepers, upon the request of any guest, to receive from said guest and safely keep money, jewelry and valuables to an amount not exceeding five hundred dollars ($500.00); and no innkeeper shall be required to receive and take care of any money, jewelry or other valuables to a greater amount than five hundred dollars ($500.00): Provided, the receipt given by said innkeeper to said guest shall have plainly printed upon it a copy of this section. No innkeeper shall be liable for the loss, damage or destruction of any money or jewels not so deposited.

Defendants urge that § 72–3 indicates that the Inn was free to condition its acceptance of Plaintiff's sample case upon Plaintiff's agreement to hold the Inn harmless for loss or damage thereto. Defendants' argument would be persuasive, absent two facts: (1) the receipt given Plaintiff by the Inn (actually, given the Inn by Plaintiff) did not "have plainly printed upon it a copy of this section," as § 72–3 directs; and (2) the evidence is uncontradicted that the Inn did not display in the office a copy of §§ 72–1 to 72–7, as § 72–6 contemplates:

§ 72–6. **Copies of this Article to be posted.**

Every innkeeper shall keep posted in every room of his house occupied by guests, and *in the office*, a printed copy of this Article and of all regulations relating to the conduct of guests. *This Chapter shall not apply to innkeepers, or their guests, where the innkeeper fails to keep such notices posted.*

(Emphasis added). The consequences of failing to post notice as required by § 72–6 are clear: rather than benefiting from the protection afforded by the statute, the innkeeper must look to the common law to define its duties and liabilities. *Holstein v. Phillips & Sims*, 146 N.C. 366, 369–70, 59 S.E. 1037 (1907) ("[Predecessor to § 72–6] not having been complied with by defendants [innkeepers], the principle of the common law obtains . . . .").

The common law rule in North Carolina is that the innkeeper is strictly liable for the loss of a guest's property, except in a few rare instances, such as where such loss is occasioned by the guest's own negligence. *Quinton v. Courtney*, 2 N.C. (1 Hawy.) 40, 42 (1793) (innkeeper liable for loss of money contained in saddlebags deposited with innkeeper's servant). *See also Neal v. Wilcox*, 49 N.C. (4 Jones) 146, 147 (1856) (stating rule that innkeepers are considered to be insurers of guests' property, regardless of negligence).

■ Defendants argue that, whatever may be the general rule of liability, the Inn is not liable to Plaintiff in this case because Plaintiff agreed that the Inn should not be held responsible for Plaintiff's property. This purported agreement is in the form of a statement printed beneath the line for Plaintiff's signature on the Inn's registration card. It reads:

NOTICE TO GUEST: YOU AGREE TO CHECK OUT AT DESIGNATED TIME. THIS PROPERTY IS PRIVATELY OWNED AND THE MANAGEMENT RESERVES THE RIGHT TO REFUSE SERVICE TO ANYONE, AND WILL NOT BE RESPONSIBLE FOR ACCIDENTS OR INJURY TO GUESTS OR FOR LOSS OF MONEY, JEWELRY, OR VALUABLES.

Plaintiff contends that this "agreement" is not an agreement at all, but rather is a self-serving statement on the Inn's part, without legal effect. It is not necessary to resolve the issue of the legal status of the disclaimer, for even assuming that it is a valid contract between the parties to limit the Inn's liability, it is void as against North Carolina public policy.

Defendants are correct in asserting that North Carolina law recognizes the validity of contractual limitations on liability in certain circumstances. *See, e.g., Miller's Mut. Fire Ins. Assoc. v. Parker*, 234 N.C. 20, 23, 65 S.E.2d 341 (1951) ("in an ordinary mutual benefit bailment, ... the bailee may relieve himself from the liability imposed on him by the common law so long as the provisions of such contract do not run counter to the public interest"). If however, the public interest demands that such contracts not be allowed, then contractual limitations on liability will not be enforced. *Id.*

This Court perceives several problems with Defendants' argument that the attempted limitation of liability is effective. First, while limitations on liability in common mutual benefit bailments are accepted, *see Miller's Mutual, id.*, such limitations are not allowed where the bailee holds itself out as a professional keeper of property. *Id.* Additionally, the rule that parties may contract as they please applies where the contract releases one party from "liability caused by his ordinary negligence in the performance of a legal duty arising out of a contractual relation," *Hall v. Sinclair Refining Co.*, 242 N.C. 707, 709, 89 S.E.2d 396 (1955); but, we have here a situation where one party is attempting to contract away its *strict liability* (not dependent upon negligence), which is imposed *by law*.

Even assuming that the rule of *Hall* applies to the strict liability situation presented in the case at bar, it is evident that the complete exoneration of the innkeeper contained in the disclaimer is repugnant to North Carolina public policy. As the court in *Neal v. Wilcox*, 49 N.C. at 147, declaimed, "*on the ground of public policy*, common carriers and inn-keepers are treated as insurers, and are liable, except 'for the acts of God, and the enemies of the State,' without proof of negligence." To allow the Inn to offer its services and accommodations to travelers and accept their remuneration therefor, and yet exempt itself from any requirement of answering to its guests for the safety of their persons and property, is unconscionable.

While North Carolina courts have not examined directly the validity of an innkeeper's absolution from liability in the light of public policy, there is guidance in the situation of a common carrier, whose liability to its customers at common law was equivalent with that of an innkeeper. *See Neal*, 49 N.C. at 147, and *Prosser & Keeton on the Law of Torts* 482–83 (5th ed. 1984). In *Gas House, Inc. v. Southern Bell Telephone Co.*, 289 N.C. 175, 183–84,

221 S.E.2d 499, *partially overruled on other grounds, State v. Southern Bell*, 307 N.C. 541, 547, 299 S.E.2d 763 (1983), the court stated that the rule against allowing a common carrier or other public utility to enforce a contract exonerating it from liability in connection with its public service is rooted in the public's right to procure the service, with full liability, for a reasonable charge. The *Gas House* court allowed the particular limitation of liability involved, however, because it related to the phone company's additional service of providing advertising in the "yellow pages," rather than to the company's public service function as a communications common carrier. 289 N.C. at 184.

The common law policy of strict liability indeed may be harsh, as the North Carolina General Assembly recognized when it enacted Ch. 72. Had the Inn wished to alleviate the draconian effect of the common law rule, it had only to follow the dictates of the statute by posting the notice required therein. This it did not do; consequently, it will not be heard to complain that the rule is untenable.

## II. DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendants maintain that Plaintiff may recover only so much of the value of the sample case contents for which he was directly liable to the owner, Plaintiff's employer. Both parties have addressed this issue in terms of an insured's right to sue for the full value of his loss, despite his insurer's having paid the insured a portion of such loss. The insurance policy on the jewels is not of record. From the record, moreover, it appears that the policy is immaterial to the issue of Frockt's right to recover all of his claimed damages.

█ The record reveals that Plaintiff was in possession of the jewels on consignment from their owner. Plaintiff therefore was a bailee of the jewels, and may recover in his own name for the full value of the loss. *Hopkins v. Colonial Stores, Inc.*, 224 N.C. 137, 139, 29 S.E.2d 455 (1944) ("It has been uniformly held that the bailee has a right of action against a third party, who by his negligence causes the loss of or an injury to the bailed articles, and this right has been held to be the same, even though the bailee is not responsible to the bailor for the loss."), *overruled in part on other grounds, Jones v. Bailey*, 246 N.C. 599, 602, 99 S.E.2d 768 (1957); *Peed v. Burleson's, Inc.*, 242 N.C. 628, 630, 89 S.E.2d 256 (1955) (bailee possesses interest in bailed property sufficient to allow him to sue third party in own name).

On oral argument, Defendants moved that the insurer be joined as a necessary party under Fed.R.Civ.P. 19, citing *Travelers Ins. Co. v. Riggs*, 671 F.2d 810 (4th Cir.1982). *See also Virginia Elec. & Power Co. v. Westinghouse Elec. Corp.*, 485 F.2d 78, 85 (4th Cir.1973) (insurer, as partial subrogee of claim, is "person to be joined if feasible under Fed.R.Civ.P. 19(a)").

As indicated above, however, Plaintiff's right to sue for the full value of the jewels is not predicated upon his being the owner of the jewels, nor is that right affected by his not being liable to the owner, because of insurance or otherwise, for the value of the jewels. *See Hopkins*, 224 N.C. at 139, 29 S.E.2d 455 (bailee's right of action remains even if bailor does not hold bailee responsible for loss). The fact that the bailor maintained insurance on the jewels, or that Plaintiff has agreed to pay to the bailor's insurer any recovery above Plaintiff's actual expenses, is immaterial.

Denial of Defendants' Rule 19 Motion will not subject Defendants to multiplicity of suits or inconsistent obligations. Plaintiff, as bailee, will be deemed to hold in trust for the bailor any excess judgment over his own loss. *Hopkins*, 224 N.C. at 139, 29 S.E.2d 455.

█ Defendants also moved for summary judgment eliminating from consideration any lost profits allegedly resulting from the loss of the sample case. Plaintiff claims that, as a result of not having a sample case to display to customers, he was unable to make sales which he ordinarily would have made.

Defendants first argue that Plaintiff is limited to recovery of the actual market value of the jewels in the case, citing 40 Am.Jur.2d *Hotels, Motels, & Restaurants* § 186 (1968). This rule, however, does not preclude recovery of lost profits; rather, it states the measure of damages to be used in determining the value of the property lost.

Defendants also contend that the evidence concerning Plaintiff's lost profits is too speculative to warrant recovery. Though Plaintiff's counsel, in his brief, promised to point out to the Court "testimony and other portions of the [Plaintiff's] deposition" which support Plaintiff's claim for lost profits, counsel failed to do so. Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment at 19. Plaintiff's so-called evidence consisted solely of his belief that he could have made sales during the two weeks that he was without his case.[1] This is insufficient to

---

1. Plaintiff's only evidence concerning his lost profits appeared in his deposition testimony:

Q. How long did it take for you to obtain a replacement sample case?

A. It took me to the end of the month, which was somewhere around the 20th to 25th, I believe. I'm not exactly sure on the exact date, but this was prime selling Christmas season.

Q. In Paragraph 20 of the Complaint, you referred to lost sales, lost opportunities. What lost sales and lost opportunities are you referring to?

A. Okay. In this—in my business, we're a small company. It's the old adage, "First come, first serve." People were buying very heavily at this time for Christmas. We were selling—we were ahead of our previous year by quite a year. I was ahead, you know, in my territory by quite a bit. And by losing three or four weeks, or whatever I exactly lost in time, was, you know, quite a bit of business dollars in volume and plus commissions to me.

Q. Has anyone ever told you that they would have purchased merchandise from you if you'd have shown up during that two- or three-week period that you didn't have a sample line?

A. I went around after I did get my line back, to see people I had not seen at that point, and they were all very sorry about the robbery, but they had all already purchased merchandise from my competitors. Now, normally, I would get orders from these people, and other jewelers and so forth, and re-orders, but I did not get these orders because I wasn't there and they were placing their orders for Christmas.

Q. Did anyone ever tell you that?

A. Yes.

Q. Do you know who told you that?

A. I think Arnold's Jewelers in Shelby was one. Just right off the top of my head. Let me think, who else did I get to see?

Q. Go ahead and take your time to think about it.

A. Okay, I mean, they don't normally come out and say, "I would have given you a $5,000 order if you had been here." They don't do that. They, you know, they buy, and if you're there when they need the goods, they buy from you. But by—this is the time of the year that everyone is rushing around to get those orders as quickly as possible. But I—Arnold's is the first that just came off of my mind, and this gentleman is out of Shelby, and he does very, very substantial business, you know, in the diamond industry and buying from people like myself.

Q. Did anyone else tell you—

A. I can't remember—

Q. —something to the same affect?

A. Yeah. I can't remember right offhand, because this is the first time I've thought about this, as far as who would have said something to me. But I know when I've gone back and gone to different customers and so forth afterwards, they were all apologetic, but they already bought and so forth, which they normally buy from me.

Q. *Which there's no guarantee you'll ever make a sell on any particular occasion?*

A. *There's no guarantee. That's where finesse and excitement, and having the right goods at the right time, is very important.*

Q. And, of course, you've always got to be concerned with your competition?

A. Oh, absolutely. And Lovebright is one of my competitors.

Q. *So, even if you'd had your case, there's no way to guarantee you would have sold anything?*

A. *I would say it's better than a 50–50 chance that I would have done quite well,* because of my previous performance through that season, and what I had done up till that point over the previous year.

Q. What stores were you intending to go to in the remainder of August?

A. Well, I was going to go up into Virginia, which I did not get a chance to finish up in there. Let's see, where was I going to go? I'm trying to think of where I was. Well, I'll tell you what, I need to rehash that a little bit, since I really can't remember exactly what stores, because, like I mentioned to you earlier, that I worked areas at a time, and this is—like I said, I have no prescribed, "Today I'm going to see this guy and tomorrow I'm going to see that guy." I make my weekly itinerary that week. But when I did get the line back, I did go back to work, I did start calling on accounts again.

support an award of damages. *Kitchen Lumber Co. v. Tallassee Power Co.*, 206 N.C. 515, 522, 174 S.E. 427 (1934) (profits lost as a result of defendant's having negligently destroyed plaintiff's railway bridge not recoverable if "speculative and contingent"). Plaintiff himself estimated his chances at making a sale to be "better than ... 50–50." Plaintiff's deposition at 159. Such evidence could support only a guess as to the amount of profits Plaintiff lost. Defendant is entitled to summary judgment on Plaintiff's claim for lost profits.

A Judgment in accordance with this Memorandum of Decision will be filed simultaneously herewith.

### JUDGMENT

In accordance with the Memorandum of Decision filed simultaneously herewith, Defendants' Motion for summary judgment and for partial summary judgment will be disposed of as ordered below.

NOW, THEREFORE, IT IS ORDERED AND ADJUDGED that:

(1) Defendants' Motion for summary judgment is *DENIED;*

(2) Defendants' Motion for partial summary judgment is *DENIED,* insofar as it seeks to limit Plaintiff's recovery to less than the full value of the sample case and its contents;

(3) Defendants' Motion for partial summary judgment on the issue of Plaintiff's entitlement to lost profits is *GRANTED;*

(4) Defendants' Motion to add a party is *DENIED;* and

(5) Plaintiff is to produce a true and correct copy of the insurance policy covering the contents of the sample case at the time of the act in question on or before the expiration of ten (10) days from the date of this Judgment.

Plaintiff's deposition at 156–160 (emphasis added).